(No. 19290.—

ALAN JAY PARRISH, Appellant, *vs.* C. R. MILLER *et al.* Appellees.

*Opinion filed October 19, 1929—Rehearing denied Dec. 7, 1929.*

BREWER & GRANT, and BARBER & BARBER, for appellant.

Oscar E. Carlstrom, Attorney General, (B. L. Catron, of counsel,) for appellees.

Mr. Justice Duncan delivered the opinion of the court:

This is an appeal by Alan Jay Parrish, appellant, from a judgment of the circuit court of Sangamon county denying the prayer of his petition for a writ of *mandamus* directing appellees, C. R. Miller, as director of the Department of Public Works and Buildings, and Frank T. Sheets, as superintendent of highways of the State of Illinois, to execute a formal written contract with appellant for the construction of certain sections of hard-surfaced road and dismissing the petition at appellant's cost.

Appellant's allegations in his verified petition are the following: Appellees gave notice that bids would be received for the letting of contracts for the construction of a durable, hard-surfaced road known as sections 147, 148 and 149 of route 121 of what is known as the $100,000,000 bond issue system of roads for different types of pavement on February 1, 1928. Appellees were vested with power to determine the type of pavement to be used in the construction of such roads. Appellant submitted bids for the construction of each of said sections of road with brick pavement. After the bids were opened, appellees, both orally and in writing, awarded the contract for the construction of the three sections of road with brick pavement to appellant as the successful and lowest responsible bidder. Appellant made preparations for the construction of the road and expended large sums of money in such preparations. He submitted to appellees his good and sufficient bond for the faithful performance of the contract, and also a legal, formal contract in due form for such work in conformity with the advertisement for bids, with appellant's bid and with the award of the contract to appellant, but appellees refused to accept such bond and to sign any formal contract with appellant for the construction of said sections

of road and have attempted to cancel the contract with appellant for the construction of said sections of road. The prayer of the petition is for a writ of *mandamus* to compel appellees to execute and deliver to appellant a formal written contract for the construction of said sections of road in conformity with the award and to compel them to accept the bond of appellant for such construction.

In their answer appellees make the following admissions, denials and allegations: Admit the advertisement for bids for the construction of said road by the use of three types of pavement, specified as (1) Portland cement concrete, (2) vitrified brick, type B-A, and (3) bituminous concrete, with or without binder course; admit that appellant was one of the bidders for the construction of the three sections of road, that he submitted bids for the construction of the road with concrete and with brick, and that he was the lowest bidder for the construction of the road with brick; admit that appellee Sheets notified appellant that the contract was awarded to him on a brick basis, subject to right of way conditions; deny that they had the power to determine the kind of road to be constructed or to determine the lowest responsible bidder, and allege that under the statute such power is vested in the Department of Public Works and Buildings, subject to the approval of the Governor of the State; deny that they determined to have the road constructed with brick and that the contract for the construction of such road was awarded to appellant, either verbally or in writing, but admit that after the bids were opened it was considered by appellee Miller that it would be advisable to accept the bid of appellant for the construction of said sections with brick; allege that the award of the contract was not then finally determined and made and that no formal contract was prepared and that such award was subject to the final determination of the Department of Public Works and Buildings and the approval of the Governor; allege that it was finally deter-

mined by the department, with the approval of the Governor, that the bid by appellant for the construction of the road with brick should be rejected and that no contract should be awarded to him; deny that appellant had made expenditures in preparation for the construction of said sections of road and deny that he tendered to appellees a good and sufficient bond and a legal contract for the construction of the road; allege that the petition is defective for want of necessary parties, and ask that their answer be treated as a demurrer and that the petition be dismissed.

Appellant in his replication denies the facts alleged in the answer in opposition to those alleged in the petition, and denies that any conference was held with the Governor at which it was finally determined to reject appellant's bid.

Appellant was the only witness for himself except George H. Reiter, president of the Springfield Brick Company, who corroborated the testimony of appellant to the effect that appellant contracted with the Springfield Brick Company on February 4, 1928, for about 5,750,000 2½-inch brick suitable for paving said sections of route 121, at the price of $30.19 per thousand, and further testified that in reliance on that contract his company began thereafter the making of 2½-inch brick.

The testimony of appellant, Alan Jay Parrish, is in substance as follows: He resides at Paris, Illinois. He has been engaged in the general contracting business since 1904, including the building of roads and streets. He has built one hundred miles of hard-surfaced roads in the State of Illinois under about twenty-five different contracts made through the Department of Public Works and Buildings, at a cost of more than $2,500,000. Most of his contracts were carried out under the supervision and control of appellees. There was no objection of any kind to his work. He told the Governor in January, 1927, that he desired to make a bid for the construction with brick of sections 147, 148 and 149. The Governor said, "Go ahead and make

your brick bid." Appellee Miller informed him that it would be in order for him to submit a bid for brick construction on said sections. Before he submitted his bid appellee Sheets informed him that a bid for the construction of said sections with 2½-inch brick would be considered. He produced his bid of February 1, 1928, for the construction of said sections with 2½-inch brick, which showed that the total amount of his bids on the three sections, of a total length of 15.508 miles, was $638,729.60, which included all labor and materials except cement, which was to be furnished by the State. On February 17, 1928, Miller told him in Chicago that he had discussed with the Governor the matter at Ottawa the day before, and that if the figures had the approval of Sheets they would award appellant the contract. On Tuesday following that date, at Springfield, Miller said, "I talked to the boss last night and we decided to give you this piece of work." Thereafter Miller said to Sheets in the latter's office, "Frank, you will make the official award of sections 147, 148 and 149 to Mr. Parrish on the basis of his brick bid." Sheets then said, "Mr. Parrish, it gives me great pleasure to officially award you the contract for sections 147, 148 and 149 of route 121 on the basis of your brick bid." Appellant was then informed that he could make his contracts and that confirmation of the award of the contract to him would be at his home when he arrived there. When he arrived at his home he received a telegram from Sheets, dated February 21, 1928, in which it was stated that the contract for the construction of the sections of the road was awarded to him "on brick basis, subject to certain right of way conditions," and that a "letter follows." On February 29, 1928, he saw Sheets at his office in Springfield and submitted to him a bond for the performance of the contract for the construction of the three sections of road. Sheets told him the contract had not been prepared yet, and that he would prefer to have three separate bonds, one for each

section of road.   He made a contract for the purchase of approximately 5,750,000 brick, let a sub-contract for the construction of bridges, arranged for sand and gravel, and made contracts for labor to be used in construction of the three sections of road.   On March 1, 1928, he received a telegram from Miller stating that he would be unable to make an award to appellant of a contract for the construction of the three sections of road.   On March 2, 1928, he asked Miller, in Chicago, his reason for sending that telegram.   Miller replied that he had been threatened and was going to protect himself.   Thereafter he (appellant) tendered Sheets three separate bonds, dated April 5, 1928, signed by himself and a surety company, one bond for the completion of the construction of each of the three sections of road, together with a formal written contract signed by him for the construction, with brick, of the three sections of road.   The contract was in the same form that had been executed in other cases for the construction of hard-surfaced roads by him for the State.   He also tendered deeds to part of the right of way on said sections of road, which deeds had prior to that time been tendered by his attorney to Miller.   No contract made by him for the construction of any hard-surfaced road by the State previous to the contract in question had been signed by any person other than himself and the director of the Department of Public Works and Buildings and the superintendent of highways.   He knew of several cases where contractors had started construction of hard-surfaced roads for the State, with the consent of appellees, before a formal contract was executed, and in one case he (appellant) had completed sixty per cent of the work of constructing a certain section of road for the State after he was awarded a contract therefor and before his bond was approved and a formal contract signed.

The two appellees were the only witnesses to testify in their behalf.   The following facts were proved, without

question, by their testimony: Under the State Bond Issue acts of 1917 and 1923 the construction of roads has been in the main of Portland cement concrete or of brick on a concrete base. Not more than one-tenth of the mileage of roads constructed is of brick. Engineers have different opinions as to the relative merits of brick and concrete for road work. The cost of construction of roads of brick on a concrete base is from fifty to sixty per cent in excess of the cost of construction of concrete. When contracts are to be let for road construction the notice calling for bids is sent to all contractors and others on the mailing list of the division of highways and published in various publications. After the bids are opened an award of contract is made, which consists of notification to the successful bidder of the intention of the Department of Public Works and Buildings to execute a contract. Copies of the contract in triplicate, consisting of the notice to bidders, a copy of the bidder's proposal and a contract form containing the proper designation of sections of road to be constructed and the formal specifications, are prepared. The contractor's bond is also prepared in triplicate. The contract and bond are sent to the successful bidder for execution, and after they are executed and returned to the department they are checked, and if in due form are signed by the superintendent of highways of the State and are then presented to the director of the Department of Public Works and Buildings for his signature. One copy of the contract and one of the bond are kept by the department and two copies of the contract and two of the bond are sent, one to the bonding company and the other to the contractor. No such formal contract was prepared and executed in this case. Bids were received from seven reputable contracting firms for the construction of the three sections of road. All bid on Portland cement pavement. Appellant was the only bidder on brick pavement. The Wabash Construction Company of Vincennes, Indiana, was

the lowest bidder for concrete construction. Under appellant's bid for brick construction the average cost per mile for construction of the three sections of road would be $46,390.48, and the average cost of construction for concrete pavement under the bid of the Wabash Construction Company would be $27,651.47 per mile. The total cost of construction of the three sections with brick pavement would be $719,423.60, including the estimated cost of the cement. The total cost of the three sections of the road with concrete pavement, under the bid of the Wabash Construction Company, would be $428,819.02, including the estimated cost of the cement. No contract for the construction of these three sections of road was prepared by anyone in the Department of Public Works and Buildings. Miller testified that he had no recollection of telling appellant on February 17, 1928, that the Governor approved of letting the contract to him; that he (Miller) was not in Ottawa the day before February 17, 1928, and did not have a conversation with the Governor at that place; that he did not think he had discussed the letting of this contract with the Governor prior to February 21, 1928; that on February 29, 1928, at Sullivan, he discussed the award of the contract with the Governor, and the Governor expressly disapproved the awarding of the contract to appellant for construction with brick on the ground that the difference between the cost of construction of said sections with brick under appellant's bid and the cost of the construction thereof with concrete under the bid of the Wabash Construction Company would be too great, and that he (Miller) saw appellant in Chicago about March 2, 1928, and told him that the Governor had disapproved the award of the construction to him.

The testimony of appellant was not contradicted by any of the testimony of appellees except as is disclosed by the evidence of appellees set forth in the foregoing paragraph.

Sections 2, 3, 4, 5, 7, 8 and 9 of the act of 1923, (Smith's Stat. 1923, pp. 1838-1840,) under which said three sections of road are authorized to be constructed, so far as material to this controversy, contain the following provisions:

Section 2: The issuance, sale and retirement of bonds and the construction of the State-wide system of roads, and all work incidental thereto, shall be under the general supervision and control of the Department of Public Works and Buildings, subject to the approval of the Governor of this State. The Department of Public Works and Buildings is authorized, empowered and directed to take whatever steps may be necessary to cause said system of roads to be constructed at the earliest possible time, consistent with good business management; shall have power to make, and shall make, all final decisions affecting the work provided for in this section and all rules and regulations it may deem necessary for the proper management and conduct of said work and for carrying out all the provisions of this act in such manner as shall be to the best interest and advantage of the people of this State; shall make it the special duty of the superintendent of highways, acting under the direction, supervision and control of the director, to see that such provisions are so carried out in good faith, and is given power and authority to purchase and supply any labor, tools, machinery, supplies and materials needed for the work. All contracts let for the construction of said work shall be let to the lowest responsible bidder or bidders, and all of said State bonds shall be sold to the highest and best bidder or bidders by said department, on such terms and conditions and on open competitive bidding, after public advertisement in such manner and for such times as may be prescribed by said department, subject to the approval of the Department of Finance. Successful bidders for the construction of said work shall enter into contracts furnished and prescribed by the department, and shall give

good and sufficient bonds to insure the proper and prompt completion of the work in strict accordance with the provisions of the contracts.

Section 3: For the purpose of carrying out the provisions of the act, said sum of $100,000,000, to be derived from the sale of said bonds, is hereby appropriated to the Department of Public Works and Buildings, such money to be payable out of the State bond road fund. Said bonds shall bear interest, payable semi-annually, from the date of their issue, at the rate of three and one-half percentum per annum, unless financial conditions make a different rate advisable, in which case said department may, with the Governor's approval, issue part or all of said bonds at any other rate of interest, not exceeding four percentum per annum. Said bonds shall be engraved and printed by said department, under the direction of the Governor, and be signed by the Governor and attested by the Secretary of State, under the seal of the State, and countersigned by the State Treasurer and by the Auditor of Public Accounts.

Section 4: All payments for work done or obligations incurred under the provisions of this act shall be made by the State Treasurer out of said State bond road fund upon warrants drawn by the Auditor of Public Accounts, based upon bills of particulars and vouchers certified by the proper official of said Department of Public Works and Buildings having knowledge of the facts upon which such vouchers are based, and audited and approved by the superintendent of highways and director of the Department of Public Works and Buildings and approved by the Governor, acting through the Department of Finance.

Section 5: The Department of Public Works and Buildings shall, on or before the first day of February of each year, make a full report to the Governor of all business transacted by said department in carrying out the provisions of this act during the year ending on the preceding 31st day of December. The Governor may cause the books

and affairs of said department relating to the work provided for herein to be audited in each year.

Section 7: The State-wide system of roads provided for shall be constructed in strict accordance with the plans, specifications, estimates of cost and contracts of the Department of Public Works and Buildings. Said department shall construct upon and along said highways durable, hard-surfaced roadways which will, in the judgment of said department, remain in good condition, with low reasonable maintenance cost, until after all said State bonds have matured. Said department shall, before entering into contracts for the construction of said roads, cause to be made reconnaissance surveys and maps, plans and specifications of said roads, together with approximate estimates of the cost of constructing the roads.

Section 8: That said Department of Public Works and Buildings shall divide said roads into convenient sections for construction purposes and shall make all reasonable efforts to have the entire State-wide system of roads completed within five years after the first construction contracts therefor are awarded.

Section 9: The Department of Public Works and Buildings shall have the right to make such minor changes in the location of the routes as may become necessary in order to carry out the provisions of the act.

The main contention of appellant is that the action of appellees in notifying him that his bid for the construction of the three sections of road with brick had been accepted and that the contract for such construction in accordance with his bid was awarded to him constituted a valid contract between him and the State for such construction and that he was entitled to have his bonds approved and a formal written contract executed; that the approval of such contract by the Governor was unnecessary to its validity, but that if such approval was necessary the record shows that such approval was given. He also contends

that appellees had the sole power to make minor changes in the location of the highway, and also to make and enter into contracts for the construction of the three sections of road without the approval of the Governor, and that such contracts are not required by the act to be in writing. It is, in fact, stated in appellant's brief that the only approval of the Governor of any act or duty to be performed by the Department of Public Works and Buildings is the approval mentioned in section 5 of the act, which refers to its annual report to the Governor.

The contentions of appellees are, (1) that no valid contract was or could be made without the approval of the Governor, and that no such approval by the Governor was given; (2) that all negotiations and agreements between the parties in this case were made subject to the preparation and execution by them of a formal written contract, which was never executed.

We cannot agree with appellant's contentions. Section 2 of the act aforesaid provides in positive terms (1) that the issuance, sale and retirement of bonds shall be under the general supervision and control of the Department of Public Works and Buildings, subject to the approval of the Governor of this State; and (2) that the construction of the State-wide system of roads, and all work incidental thereto, shall also be under the general supervision and control of the department, subject to the approval of the Governor. These two provisions indicate clearly that all duties of appellees with reference to the issuance, sale and retirement of bonds, the construction of the roads, and all work necessary for such construction, shall be under the general supervision and control of the Department of Public Works and Buildings, subject to the approval of the Governor. One of the first duties with reference to the construction of the roads by the department is the securing of a legal contract in accordance with the provisions of the act, and the department must secure the approval by

the Governor of the contract to make it valid. How could the construction of the State-wide system of roads be subject to the approval of the Governor if the making of the contracts for such construction is not to be subject to his approval? The last provision of section 2 is to the effect that the contractor for such construction shall give a good and sufficient bond to insure the completion of the work by him "in strict accordance with the provisions of the contract." The Governor could not make any objection to such construction that would be effective, or have any voice as to the character of the construction, unless he had the right and power to approve or reject the making of the contracts for such construction. The last provisions of section 2 also indicate with certainty that the contracts for the construction of said highways are to be in writing. The language in the last sentence of said section, "successful bidders for the construction of said work shall enter into contracts furnished and prescribed by the department," and give good bonds to secure the proper completion thereof "in strict accordance with the provisions of the contracts," is inconsistent with the idea that the contracts may be oral contracts.

The further contention of appellant that appellees had the sole power to make minor changes in the location of the highways has been determined otherwise by two decisions of this court, *MacGregor* v. *Miller*, 324 Ill. 113, and *People* v. *Department of Public Works*, 326 id. 589. The former of these two suits was begun in the circuit court of Livingston county by five citizens and tax-payers by filing a petition in the name of the People of the State of Illinois on their relation, for a writ of *mandamus* against Cornelius R. Miller and Frank T. Sheets, director and superintendent of the Department of Public Works and Buildings, to compel them to locate and construct route 4 with the least diversion from the old route and the most practicable and convenient return thereto over certain specified creeks and

bridges in the city of Pontiac, which were a part of the old highway through that city. It was held by this court in that case that under the provisions of section 2 aforesaid the duties of the respondents were subject to the approval of the Governor, and that as the petition did not disclose whether or not such approval had been obtained, *mandamus* would not lie. The express ruling in that case is that *mandamus* will not issue in any case to compel a public official or officials to perform a ministerial act when the evidence shows that the performance of that duty depends upon the co-operative action of a third person who is not before the court. It was also held, inasmuch as all official action of the respondents in carrying out the provisions of the State-wide Highway act is subject to the approval of the Governor and as such approval cannot be coerced by *mandamus,* that *mandamus* would not lie against the respondents to compel the performance of any duties imposed upon them by said act with reference to the location or re-location of roads. *People* v. *Department of Public Works, supra,* was the same character of proceeding in *mandamus* and for a similar purpose for which the MacGregor suit was instituted, and the decision in the *MacGregor case* was cited as authority in the other case and was followed strictly in all its rulings.

The decisions in the two cases aforesaid are decisive of the questions before this court in the present suit. Those two suits involved questions under the $60,000,000 bond act, approved June 22, 1917, in force July 1, 1917, and adopted November 5, 1918, for the construction of hard-surfaced roads. The first nine sections of that act are the same in every particular as the nine sections of the $100,000,000 bond act for the construction of such roads, under which this suit was brought, except as to the dates in the acts and the amount of hard road bonds that were to be issued and sold. Cahill's Stat. 1923, par. 183,

p. 2984, and par. 198, p. 2993; Smith's Stat. 1923, par. 266, p. 1832, and par. 281a, p. 1838.

The evidence of appellees shows that the Governor refused to approve the awarding of the contract to appellant for the construction of the sections of road aforesaid and stated his reasons for so refusing, which were good grounds for such refusal. There were other good grounds for such refusal. The bid of appellant was the only bid for the construction of the sections of road with brick, and was not for that reason a competitive bid within the meaning of the statute. The bid was for construction with 2½-inch brick. The construction of said sections with 3-inch brick was called for by the advertisement for brick construction. His bid was $290,604.58 in excess of the lowest bid for concrete pavement, or more than sixty-seven per cent in excess of the lowest bid for concrete pavement. The evidence of appellees is to the effect that the usual cost of brick pavement on a concrete base is from fifty to sixty per cent in excess of the cost of construction with concrete.

There is another reason why the circuit court did not err in denying the prayer of the petition, It is well settled that the writ of *mandamus* will not be issued when its issuance will accomplish no beneficial result or will be of no avail to the party applying for it. (*MacGregor* v. *Miller, supra; Klokke* v. *Stanley,* 109 Ill. 192.) It is the position of appellant that he already has a valid contract for the construction of the three sections of road and that a written contract duly executed by appellees and approved by the Governor is not necessary. If he had such a legal and binding contract when he began his suit it would be of no more force and effect if formally written up, executed and approved by the Governor, and the issuance of the writ would accomplish no beneficial result to appellant.

The circuit court did not err in denying the prayer of the petition, and its judgment is affirmed.

*Judgment affirmed.*