McCoy et al. *v.* General Glass Corporation.

[No. 16,276. Filed November 28, 1938. Rehearing denied January 17, 1939.]

118

*John J. McShane, E. Meeks Cockerill,* and *Bowers & Mendenhall,* for appellants.

*James L. Murray,* for appellee.

WOOD, J.—This is an appeal by the appellants, dependents of Clyde Joseph McCoy, from an award of a majority of the full Industrial Board denying them compensation for the death of McCoy because of an injury alleged to have resulted from an accident arising out of and in the course of his employment by the appellee. The appellants have properly assigned as error for reversal that the award of the full Industrial Board is contrary to law.

The record presents but one question for our consideration, namely: Was McCoy's death caused by an accident arising out of and in the course of his employment by the appellee?

This court, on an appeal to it from an award of the Industrial Board, is controlled by well established rules of procedure, thus it is the province of the Industrial Board to find the facts, and in determining the ultimate facts it may draw any reasonable inferences from the facts proved, and on appeal, this court will not weigh the evidence nor draw inferences therefrom leading to a different conclusion from that reached by the Industrial Board. *Espy* v. *Indianapolis Power and Light Co.* (1932), 94 Ind. App. 184, 180 N. E. 190. The Industrial Board is an administrative body, not a court, so the strict rules enforced in courts of law respecting the admission of evidence do not apply to such board, so the admission of incompetent evidence by the Industrial Board will not operate to reverse an award, if there be any basis in the competent evidence to support the award. Under such circumstances, the admission of incompetent evidence is regarded as harmless error. *Inland Steel Co.* v. *Pigo* (1932), 94 Ind. App. 659, 182 N. E. 279. "The Industrial Board has a procedure of its own and borrows nothing by implication from the Civil Code or from the courts of common law. It is an administrative body,

and, as such, is not bound by the rules of court procedure." *T. J. Dye and Son* v. *Nichols* (1923), 81 Ind. App. 13, 19, 141 N. E. 259. The burden is on the applicant to establish each fact necessary to a legal award of compensation. *Milholland Sales and Engineering Co.* v. *Griffiths* (1931), 94 Ind. App. 62, 178 N. E. 458. The rule against hearsay has always prevailed in Indiana. If hearsay testimony which does not come within any of the exceptions to the general rule is admitted in evidence before the Industrial Board it cannot be accepted for any purpose. While it is true that the Industrial Board is not a court, it is an administrative body charged with the administration of the Workmen's Compensation Law. "Upon it rest the duty and responsibility of determining, within its special jurisdiction, the rights of men, women and children. If those rights were suffered to depend on hearsay, no one would be secure." *Indiana Bell Telephone Co.* v. *Haufe* (1924), 81 Ind. App. 660, 667, 144 N. E. 844. An award of the Industrial Board must be based on something more than mere guess, surmise, conjecture or possibility. *Milholland Sales and Engineering Co.* v. *Griffiths, supra.*

A coroner's verdict as to cause of death of an employee is not admissible in evidence in a proceeding to secure compensation for his death under the Workmen's Compensation Act. *Spiegel's House Furnishing Co.* v. *Industrial Commission of Ill.* (1919), 288 Ill. 422, 123 N. E. 606, 6 A. L. R. 540.

The substance of the hypothetical question propounded to an expert witness for the purpose of eliciting his opinion must have intimate connection with the testimony submitted in the case, and, if there is no testimony in the case tending to prove the facts assumed in the hypothetical question, such question is improper. Vol. 3 Jones Commentaries on Evidence (2d Ed.), §1326. "Generally speaking, a hypothetical ques-

tion should state all the facts relevant to the formation of an opinion, and then, assuming the facts stated to be true, ask the witness whether he is able to form an opinion therefrom, and, if so, to state such opinion." Vol. 3 Jones Commentaries on Evidence (2d Ed.), §1338. The ordinary rule is that the opinions of experts upon the merits or upon the very matter to be tried are inadmissible, so questions calling for expert opinions should be so framed as not to call upon the witness to determine controverted questions of fact or to pass upon the preponderance of evidence. Vol. 3 Jones Commentaries on Evidence (2d Ed.), §1321.

With these rules of law as a monitor, we have made a careful examination of all the evidence in the record in the instant case. The material, uncontroverted, controlling facts may be briefly summarized as follows: McCoy was thirty-eight years of age; he had been in the employ of the appellee or its predecessors in the operation of a glass factory for a period of approximately eleven years; at the time of his death he was working in the capacity of an upkeep man and, as such, it was his duty to service and keep the machines molding the articles being manufactured (bottles in this case) in repair and working condition; the building in which McCoy worked was about 300 feet long and 200 feet wide; the roof and sides were covered with corrugated tin, with windows in the sides, ventilators in the roof and ventilating fans located about the building; the floor was covered with concrete; this room was occupied by glass furnaces, machines to make the bottles, stackers, leers, and conveyors; when the factory was in operation, molten glass was contained in three tanks about 75 feet long and 50 feet wide which were placed side by side; seven machines were connected with the middle tank, designated as tank number two, and also feeders which conveyed molten glass to the machine where it

was molded into bottles, passing from the machines onto the conveyors thence into the leers; it requires about 2200 degrees fahrenheit to heat glass into a molten state; machines designated as number 8, 9, and 10, connected with tank number two, were located in the hottest place in the factory because located in the center thereof, where ventitlation was very poor; machine number 10 was the hottest machine for an upkeep man to work on; when a machine broke down or went out of service it was necessary for the upkeep man to begin work on it immediately without waiting for it to cool and he was subjected to about four times as much heat as the other employees in the factory; the leers were heated with gas and gas fumes and smoke settled around machines number 8, 9, and 10 more than other machines; the temperature in the factory was almost twice as hot as on the outside; on August 24, 1937, the maximum temperature was 82, the minimum 62, and the set which was taken at five o'clock in the evening upon that day was 76 degrees; McCoy was never off duty because of sickness during the entire eleven years that he worked in the factory except twice, once about two or three years before his death for a period of two weeks because of quinsy, again about a year before his death when he had his tonsils removed; the weather the week before his death was very hot and McCoy worked some overtime during that week; when he came home from the factory his clothing was wringing wet with sweat and his face was smeared with grease and grime; he seemed tired and exhausted; on August 23rd before his death, McCoy worked from five o'clock in the morning until one o'clock in the afternoon; he complained of having a cold on the morning of this day; that night he complained of his muscles being sore; he was tired and restless; Mrs. McCoy, thinking that he had a cold, rubbed some liniment on him, after which he went to

sleep; she called him around five o'clock the next morning, August 24th, and he got up, ate his breakfast and went to work; that morning he was working on machines number 8, 9, and 10, connected with tank number two; at about a quarter after nine in the forenoon, he was standing beside the conveyor from machine number 10, looking at the bottles as they passed by him, he had his hand up to his face to deflect the heat from the bottles; while in this position McCoy fell to the floor striking his head against the leg of one of the conveyors; workmen carried him to the first-aid room where he died in a few minutes, never regaining consciousness; he was sweating some and there was sweat on his face and forehead; the nurse who attended him testified that he was cyanotic in the face and was sweating as much as men usually sweat in a temperature of that degree; at the time McCoy fell, it was twice as hot around number 10 machine as it was on the outside; the sun beat down on the tin roof and there was heat through the furnace, through the leer and from the hot molds, "You can't breathe normal"; McCoy never complained any to speak of on the morning of August 24th; he said he felt like he had a slight cold, "his chest ached a little like he had a cold and it sort of sat on his chest"; it was not safe to get too close to machine number 10 when in operation because if clothing touched any of the molds or blanks it would get on fire.

About six months previous to McCoy's death, he submitted to a thorough physical examination by the physician who was called to testify as an expert witness in appellants' behalf. Upon that examination it was found that there was not a thing wrong with his heart, liver, kidneys, bladder, urinary tract, urine, or in his general condition. There was no autopsy held upon his body after death.

The appellants called one physician to testify as an

expert while the appellee called two physicians to testify as experts. The qualification of each of the physicians to testify in that capacity was agreed to by the parties.

A long and involved hypothetical question taking up eight pages of the record was propounded to the physician called to testify on behalf of the appellants, in answer to which he gave it as his opinion, without equivocation, that McCoy died as a result of heat exhaustion.

The same question with the additional hypothesis, that McCoy complained of aching or pain in his chest on the morning of his death, that he was short of breath, that the temperature in the glass factory was not unusually high, but cooler than usual for the summer days, that he seemed to perspire freely and normally prior to his death, that there was no complaint of any dizziness, headache or nausea, and that he was cyanotic when the nurse saw him a very few moments after his first collapse, was propounded to one of the physicians called by the appellee, in answer to which he gave it as his opinion "that the first and most logical explanation would be a cardiac death but that there could be other causes." There was further direct examination followed by cross-examination. Finally the following question was propounded to him on cross-examination: "It is true that in this case it is highly a matter of conjecture, your answering that hypothetical question, as to exactly what is the matter with the man, what caused his death?" To which the witness answered "I couldn't tell exactly."

The other physician called by the appellee to testify as an expert was the coroner of the county in which McCoy died. He was not asked to express an opinion as to the cause of McCoy's death, based upon any hypothetical question propounded to him but predicated his opinion upon information which he ascertained from an investigation into the cause of

death in his capacity as coroner. This witness, in response to questions asked him by counsel for appellee, related how in his capacity as coroner he had talked with various people who had knowledge of the facts previous to and at the time of McCoy's death, how he held the coroner's inquest and that he had certain people testify, which testimony was reduced to writing and incorporated as part of the coroner's evidence upon which he founded his opinion and verdict as to the cause of death. Thereupon counsel for appellee asked the witness this question: "Well, you gave your opinion, doctor, of the case, in this man's death, which is based upon the investigation that you made and your examination of him?" Over the objection of the appellants, the witness was permitted to give the following answer: "My opinion was that it was a natural death. I believe that it was probably due to some condition relative to the heart and the blood vessels around the heart and about the heart."

While it must be conceded that the strict rules as to the admissibility of evidence in courts of law do not apply to hearings before the Industrial Board, can this court say on the whole record before it in the instant case, that the admission of this testimony into evidence and its consideration by the Industrial Board was not prejudicial to the substantial rights of the appellants and therefore reversible error? The answer which the physician was permitted to give to the question propounded to him had the effect of placing before the Industrial Board parol evidence of the contents of a written document and this was error. It also had the effect of placing before the Industrial Board for its consideration the contents of the coroner's verdict. This was clearly improper. The reason for this rule is very tersely stated by the Supreme Court of Illinois in the case of

*Spiegel House Furnishing Co.* v. *Industrial Commission, supra,* in the following language (pp. 431, 432):

"The allowance of coroners' verdicts as evidence in civil suits is wrong in principle, and necessarily results in much injustice to litigants. A coroner, under our law, has no judicial power. Such power is vested by the Constitution in the courts thereby created. (*Peoria Cordage Co.* v. *Industrial Bd., supra.*) At common law the office of coroner was judicial in its nature. But if he were a judicial officer, invested with judicial powers and duties, we are unwilling to further indorse the holding that any litigant should be bound by the verdict of a coroner's jury, in whose inquest he had no right to participate and did not do so. The most solemn finding or judgment of a court is not admissible against a litigant, either as *res judicata* or as an estoppel by verdict, unless he was a party to that judgment. *Chicago Title & T. Co.* v. *National Storage Co.,* 260 Ill. 485, 103 N. E. 227. The rule has always been recognized that no person shall be affected by any judicial investigation to which he is not a party, unless his relation to some of the parties was such as to make him responsible for the final result of the litigation. 1 Freeman, Judgm., §154.

"It is a well-known and well-recognized rule that the evidence of a witness or witnesses, dead or alive, in any suit, although prosecuted to final judgment, is not admissible against any third party in another suit who was not a party to such judgment. The main ground upon which this rule is based is that such third party had no right of cross-examination of such witness or witnesses. The evidence of witnesses before the coroner's jury, dead or living, is not admissible against either party in a civil suit for damages, and for the same reasons above given. *Pittsburgh, C. & St. L. R. Co.* v. *McGrath,* 115 Ill. 172, 3 N. E. 439; *Knights Templars' & M. Life Indemnity Co.* v. *Crayton,* 209 Ill. 550, 70 N. E. 1066. If the evidence of the witnesses before the coroner's jury is not receivable against a party in the civil suit growing out of the death of the party over whose body the inquest is held, and the judgment and findings of a court in another suit concerning the same death are not admissible,

there is no sound reason, in our judgment, why the inquest of a coroner ought to be admissible to prove, prima facie or otherwise, any issue in such case."

The testimony of this witness lacks probative force for another reason. His opinion was not based upon an hypothesis supported by any evidence adduced from the testimony of witnesses called to testify before the Industrial Board, but from statements and testimony given by witnesses when he made the investigation as coroner into the cause of McCoy's death. In other words, in so far as these appellants were concerned, his opinion was based upon hearsay evidence.

Giving the appellee full benefit of every presumption to which it is entitled under the law, we conclude upon an examination of the whole record that the ends of justice will be better served by a rehearing of this cause.

The award of the Industrial Board is therefore reversed, with instructions to grant the parties a rehearing and for further proceedings not inconsistent with this opinion.