VIRGINIA MOHLER, Indiv. and as Adm'r of the Estate of Harold Mohler, Deceased, Plaintiff-Appellee, *v.* ROBERT W. BLANCHETTE *et al.*, Defendants-Appellants.

First District (1st Division)    No. 80-3167

Opinion filed April 19, 1982.—Supplemental opinion filed on denial of rehearing June 1, 1982.

Lord, Bissell & Brook, of Chicago (Cornelius P. Callahan and Hugh C. Griffin, of counsel), for appellants.

John D. Hayes, of John D. Hayes & Associates, Ltd., of Chicago, for appellee.

JUSTICE O'CONNOR delivered the opinion of the court:

This action was instituted by plaintiff, Virginia Mohler, widow of Harold Mohler and administrator of his estate, against defendants, Robert W. Blanchette, Richard C. Bond and John H. McArthur, trustees of Penn Central Transportation Company (Penn Central), to recover damages under the Federal Employers' Liability Act, 45 U.S.C. §51 *et seq.* (1970), for a violation of the Safety Appliance Act, 45 U.S.C. §1 *et seq.* (1970), which allegedly caused the death of her husband. Plaintiff's complaint was originally filed in 1970. In 1974 the case was dismissed for want of prosecution with leave to refile the action within one year. Plaintiff refiled the case in 1975 and the case was tried in July of 1980. The jury awarded plaintiff $500,000. Penn Central appeals seeking a new trial, contending that (1) evidence that decedent died as a result of a heart attack was improperly excluded from evidence; (2) certain hearsay statements made by decedent were improperly admitted into evidence; and (3) plaintiff's closing argument was improper. We affirm.

On December 28, 1967, decedent Harold Mohler was working as a brakeman in the caboose of Penn Central train No. 791 on its scheduled run from Kankakee, Illinois, to Zearing, Illinois. The train engineer Rene Benoit, the conductor D. Drazy and the brakeman Robert Shearer were riding on the engines. The train was just east of Reddick, Illinois, when it went into a recognized emergency situation called a "break-in-two" when the train broke into two sections. At the time the break occurred, the engineer Benoit was in the process of slowing down the train for a scheduled stop at Reddick. The speed of the train was estimated at between 10 to 15 or 20 to 30 miles per hour where the speed limit was 40 miles per hour. When the train broke in two sections, the train's emergency brakes applied automatically. A "terrific noise" or "loud whoosh sound" was heard throughout the train, in both the engine and the caboose. Shearer testified that at any speed ranging from 10 to 25 miles per hour, the caboose stops "suddenly and you have to hang on because otherwise you're going to get thrown on the floor" despite the fact that a good engineer could bring the engine section of the train to a smooth stop.

After the train stopped, a broken knuckle was discovered and a new one obtained from another train. After approximately a one-hour delay, the train continued on and eventually arrived at Streator, Illinois. At Streator, decedent went to the engine and asked Benoit what had happened at Reddick and was informed by Benoit of the emergency stop. Decedent then informed Benoit that he had been thrown against the wall of the caboose and had hit his head on the caboose wall. At that time, Benoit noted a cut on decedent's ear. Shearer testified to seeing approximately a tablespoon of blood inside decedent's ear.

When the train crew arrived at Zearing, they checked out at Ladd

junction and proceeded by automobile to a local Holiday Inn. Shearer testified that Mohler seemed very tired, that he slumped down in the seat of the car and failed to respond to Shearer's repeated attempts to communicate with him. Shearer shared a room with decedent that night. He testified that decedent was not his usual self and seemed unusually tired. On the return trip on the morning of December 29, Shearer noted that decedent seemed unusually tired and not too conscious of what he was doing. At Zearing, decedent prepared an accident report.

Decedent's work assignment book indicates that he did not work all of his scheduled assignments after December 28, 1967. Mrs. Mohler explained the difference between the notations in the time book listed as "laid-in" and "laid-off." The former indicated that decedent was available for work, but that the job was cancelled; the latter indicated that he called in that he would not be working. Although decedent did work on December 29 on the return run from Zearing to Kankakee, he "laid-off" on December 30 and 31. Subsequent to December 28, 1967, and up to January 19, 1968, decedent worked assignments both as conductor and fireman without incident. Shearer worked with decedent on January 11, 1968, and noted nothing unusual.

Mrs. Mohler and her family testified to numerous incidents witnessed by them during the period between December 28, 1967, and January 19, 1968. Kathleen Mohler Tamasiewicz, a daughter, recalled a "very bad headache." Caroline Mohler, another daughter, testified to seeing blood on the side of her father's face and ear the day following the accident. She also related various incidents of unusual behavior: an episode where he abruptly left the room during a conversation with her, sat in a chair holding his head in his hands and did not respond to her questions; another incident of "moaning" and "making incoherent noises" while thrashing about in bed; and "listless" behavior at a New Year's Eve party where he was observed in a trance-like state.

Mrs. Mohler testified to numerous instances of Mr. Mohler's odd behavior: she noted that he was "particularly quiet" at the New Year's Eve party where at one point he "disappeared" and was found lying down in one of the bedrooms; sitting in a chair holding his head and complaining that his head hurt; uncharacteristically striking his daughter over a triviality; and a staring episode on January 17. Decedent's brother-in-law testified to Mohler's "lethargic" behavior at the New Year's Eve party.

Decedent's mother, Mildred Mohler, testified to a conversation between decedent and herself. This testimony is subsequently set forth herein.

On January 17-18, 1968, decedent worked as a conductor on the regular run from Kankakee, Illinois, to Elkhart, Indiana. Norman Phillips worked as the rear brakeman and noted nothing unusual about Mohler on

that trip. On January 18 they stayed together at the Elkhart Y.M.C.A. and during the 22 hour and 50 minute layover he noted nothing that would make him think Mr. Mohler was in ill health or suffering from chest pains. On January 19, 1968, Mohler, Phillips and the rest of the train crew returned for work at the Robert Young railroad yard in Elkhart, Indiana, at approximately 3 a.m. Phillips went to the caboose, while Mohler went to the railroad tower to review instructions for the train. Approximately an hour later, Mohler came back to the rear of the train and climbed up into the caboose. Phillips testified that Mohler had just entered the caboose and did not respond to a question Phillips asked. Mohler had put his grip down when he suddenly collapsed to the floor, gasping for breath. Phillips told the railroad car inspector to call for an ambulance and a doctor. After three to five minutes later, Mohler's eyes rolled back into his head, he stopped breathing and his pulse and heartbeat disappeared.

Dr. Deland Burns, plaintiff's first medical witness, testified that at the request of Mohler's brother-in-law, Dan Hequet, he performed an autopsy on Mohler's body after it had been embalmed. Dr. Burns testified that it would have been much better to have performed the autopsy before embalming. The trocar, a pipe-like instrument used to insert embalming fluid, had totally penetrated Mohler's heart and Dr. Burns attributed all the heart damage he found to that fact. He noted that Mohler's heart was of normal size. Dr. Burns was unable to determine a cause of death. He testified to an abnormal accumulation of mucoid secretions in the lungs which obstructed some of the ramifications of the respiratory system, particularly the secondary bronchus to the right lower lobe and the tracheal bronchial tree. He stated that primary lung disease was not the cause of death and that the cause of death was not coronary related. While he was not able to determine an apparent cause, a focal central nervous system disturbance could be a primary initiating cause of death and could manifest itself in an occlusion of the tracheo-bronchial tree. Dr. Burns testified that head trauma can cause brain damage without being manifested in a skull fracture or even be perceivable to a person performing an autopsy three weeks later, and that he very well could have missed evidence for trauma. Dr. Burns agreed that if heart occlusions or arrhythmia occurred suddenly there might be no palpable change in the heart itself. He also testified that the trocar could have dislodged a pre-existing heart occlusion so that it would not be observable.

Dr. Joseph Segarra, the plaintiff's second medical witness, concluded that the cause of death was of primary central nervous system origin, in that the trauma to the brain resulted in a series of minor epileptic episodes manifested in the bizarre behavior witnessed by his family, leading to a disturbance in the respiratory mechanism which produced a constriction of the windpipes, leading to lack of oxygen and ultimately death. The

minor epileptic episodes led to a laryngospasm which was indicated by the choking sounds heard by Phillips. He further testified that the lesions that lead to epileptic attacks can be very subtle and are only revealed upon sophisticated microscopic examination which involves the use of special stains to pick up the lesions. Dr. Segarra also observed that the decedent's work assignment time book appeared to be a very well-organized book which, on the date following the date of the accident, became disorganized and jumbled, indicating further evidence of a change in Mohler's behavior or cognitive abilities.

The Elkhart County Coroner, Dr. Westfall, was permitted to testify that he had no recollection of inquiring into the death of Harold Mohler on January 19, 1968, and that the summary and inquest of the death of Harold Mohler bore his signature, was made in the ordinary course of his business as coroner of Elkhart County on January 19, 1968, and states Mohler's time of death as 5:45 a.m. Dr. Westfall was permitted to read from the report as follows:

> "This 36-year-old man collapsed and died suddenly at the Robert Young Railroad Yard in Elkhart. I pronounced the victim dead shortly after, beside the tracks near the caboose in the railroad yard. There was no evidence of violence or foul play. I ordered the body moved to the funeral home pending further arrangements. The said deceased being a male of the age of 36 years, six feet and one inches in height, black hair, gray eyes, medium complexion, nativity white."

Defendant submitted an offer of proof regarding the facts Dr. Westfall would have testified to if permitted: Pursuant to his official statutory duties as county coroner, Dr. Westfall interviewed witnesses and otherwise made an investigation into the facts surrounding Mohler's death in an attempt to determine the cause of death. On January 30, 1968, Dr. Westfall embodied his findings in his official report which in pertinent part stated as follows:

> "This 36 year old man collapsed and died suddenly after suffering severe chest pains shortly after he reported for work at the Robt. Young R.R. Yard in Elkhart. The victim was in apparent good health but slumped over from a seat in the caboose of train #L53 with severe chest pain and died within minutes. Artificial resuscitation was attempted by witnesses but was unsuccessful. I pronounced the victim dead shortly after beside the tracks near the caboose in the R.R. yards. There was no evidence of violence or foul play. I ordered the body moved to the funeral home pending further arrangements.
>
>          * * *
>
> In my opinion death was natural due to:

1. Acute coronary occlusion."

Defendants' first medical witness, Dr. Leestma, noted that the weight of Mohler's heart, as shown in Dr. Burns' autopsy report, was abnormally heavy for his age and weight. Dr. Leestma testified that the cause of Mohler's death was cardiac arrhythmia. He further testified that neither the events of December 28, 1967, nor the incidents of unusual behavior testified to by Mohler's family changed his opinion as to cause of death. In his opinion, these incidents were not epileptic seizures of any kind. Dr. Leestma testified that in his experience sudden heart attack death often leaves no detectable physical abnormality. He stated during cross-examination that some type of head injuries could produce epileptic seizures within hours or days following head trauma and admitted that he had testified at his deposition that it was possible that the decedent had a seizure causing him to choke on his mucous, leading to anoxia and ultimately cardiac standstill. Dr. Leestma stated that in cases of head injury where the patient survives more than a few hours, microscopic examination of the brain can reveal lesions which are not apparent on gross examination of the brain. He further admitted that he testified at his deposition that no pathology or abnormality was demonstrated in the autopsy report of Mohler.

Defendants submitted an offer of proof as to facts Dr. Leestma would have testified to if he had been permitted: Dr. Leestma would have testified that pathologists, including himself, customarily rely on information such as that contained in Dr. Westfall's coroner's report in reaching conclusions as to the cause of death. Dr. Leestma would rely on such a document in this case, including the chest pain information contained therein as "very important" and "most significant" factor in support of his cardiac arrhythmia opinion.

Defendants' second medical witness, Dr. John Hughes, testified that it was possible for an insignificant head injury to result in post-traumatic epilepsy, but that in his opinion Mohler's death was not caused by post-traumatic epilepsy. Dr. Hughes also testified that pathological evidence of post-traumatic epilepsy may not be immediately visible upon examination by a pathologist or neuropathologist. He stated that the various incidents of unusual behavior testified to by Mohler's family were not epileptic attacks or seizures. In Dr. Hughes' opinion, the bump on the head suffered by Mohler on December 28, 1967, had no causal connection with his subsequent death on January 19, 1968.

On rebuttal, plaintiff called Dr. Donal O'Sullivan, a pathologist and a lawyer. Dr. O'Sullivan testified on behalf of plaintiff that the weight of decedent's heart was near but not beyond the maximum acceptable limit for a person of Mohler's age and size. Dr. O'Sullivan further testified that

in his opinion Mohler's death was not primarily a cardiac death but was primarily a central nervous system death secondary to the head injury suffered by Mohler on December 28, 1967.

Defendants' first contention is that evidence that decedent died as a result of a heart attack was erroneously excluded. Pursuant to his duties as coroner (Ind. Code §17—3—17—4, recodified as Ind. Code §36—2—14—6 by Acts 1980, P.L. 212, sec. 1 amended by Acts 1981, P.L. 39, sec. 2), Dr. Westfall investigated the facts surrounding Mohler's death. In his coroner's report, he set forth his finding that Mohler had complained of severe chest pains just prior to his collapse in the caboose and stated his opinion that the cause of Mohler's death was acute coronary occlusion. The trial court, relying on section 18 of "An Act to revise the law in relation to coroners" (Ill. Rev. Stat. 1979, ch. 31, par. 19) ruled that Dr. Westfall's findings or conclusions were inadmissible. The trial court also ruled that defendants' expert, Dr. Leestma, was precluded from relying on Dr. Westfall's report as a basis for his opinion.

In Illinois, a coroner's jury shall "inquire how, in what manner, and by whom or what, the said dead body came to its death, and of all other facts of and concerning the same, together with all material circumstances in anywise related to or connected with the said death, and make up and sign a verdict, and deliver the same to the coroner." Ill. Rev. Stat. 1979, ch. 31, par. 15.

In *Spiegel's House Furnishing Co. v. Industrial Com.* (1919), 288 Ill. 422, 123 N.E. 606, the court held that a coroner's verdict was not admissible in proceedings for the adjustment of compensation under the Workmen's Compensation Act. (Ill. Rev. Stat. 1919, ch. 48, par. 126 *et seq.*) Subsequently, the Illinois General Assembly added the following proviso to section 18 of "An Act to revise the law in relation to coroners" (Ill. Rev. Stat. 1979, ch. 31, par. 19):

"Provided, further, that in any suit or proceeding hereafter commenced for the recovery of damages arising from or growing out of injuries caused by the negligence of any person, firm or corporation resulting in the death of any person or for the collection of a policy of insurance, neither the coroner's verdict returned upon the inquisition as provided herein, nor a copy thereof, shall be admissible as evidence to prove or establish any of the facts in controversy in said civil suit or proceeding."

The instant case involves an Indiana coroner's verdict (Ind. Code §17—3—17—7, recodified as Ind. Code. §36—2—14—10 by Acts 1980, P.L. 212, sec. 1) and not a "coroner's verdict returned upon the inquisition as provided [pursuant to "An Act to revise the law in relation to coroners" (Ill. Rev. Stat. 1979, ch. 31, par. 1 *et seq.*)]." (Ill. Rev. Stat. 1979, ch. 31,

par. 19.) However, we find that the Indiana coroner's report here was properly excluded from evidence. In Indiana, the coroner with the aid of the police agency having jurisdiction in the area conducts an investigation "in order to determine how and in what manner [the deceased] came to his death and shall cause a medical investigation to be made in order to determine the cause of death." Ind. Code §17—3—17—4, recodified as Ind. Code §36—2—14—6 by Acts 1980, P.L. 212, sec. 1 amended by Acts 1981, P.L. 39, sec. 2.

■■ The verdict of an Illinois coroner's jury is excluded from evidence because as a coroner has no judicial power, his verdict should not "be admissible as evidence in civil suits for the purpose of establishing personal liability against any individual in cases where the death of any person is charged or to establish a defense to such a suit, or for the purpose of establishing other issues between private litigants of the nature indicated in the cases just reviewed." (*Spiegel's House Furnishing Co. v. Industrial Com.* (1919), 288 Ill. 422, 430.) Although the Indiana coroner's verdict is not the verdict of a coroner's jury, but rather the verdict of the coroner himself after conducting an investigation with the aid of the police, the rationale behind the rule excluding the verdict of the Illinois coroner's jury from evidence is equally applicable to the Indiana coroner's verdict. We also note that in Indiana the coroner's verdict is not admissible in a civil case to establish cause of death. (*McCoy v. General Glass Corp.* (1938), 106 Ind. App. 116, 17 N.E.2d 473.) We find that the Indiana coroner's verdict was properly excluded as evidence to prove or establish any of the facts in controversy in this case.

Because we find that the coroner's report in the instant case was properly excluded from evidence, we need not address defendants' argument that the report be admitted under the past recollection recorded exception to the hearsay rule.

Defendants also argue, however, that it was improper for the trial court to preclude defendants' medical expert, Dr. Leestma, from stating his reliance on Dr. Westfall's report as a basis for his own opinion that the cause of Mohler's death was coronary arrhythmia.

■■ In *People v. Ward* (1975), 61 Ill. 2d 559, 338 N.E.2d 171, our supreme court held that a medical expert could properly base his opinion upon the report of another doctor who did not testify. The *Ward* court quoted Federal Rule of Evidence 703 with approval as follows:

> " 'The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.' " (61 Ill. 2d 559, 567.)

We note that in *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, our supreme court adopted Federal Rules of Evidence 703 and 705 and stated that the trial procedures embodied in those rules would be applied to cases in which trial commenced on or after September 1, 1981. The instant case was tried before September 1, 1981, and therefore *Wilson v. Clark* is inapplicable. Dr. Leestma testified that Dr. Westfall's report was the type customarily and reasonably relied upon by experts in the field of pathology. We find that under the authority of *People v. Ward* the testimony of Dr. Leestma that he based his opinion as to Mohler's cause of death in part on the report of Dr. Westfall was admissible as an exception to the hearsay rule. However, we find that this error was harmless because Dr. Westfall's findings that Mohler died as a result of a heart attack was merely cumulative to Dr. Leestma's independent opinion that Mohler's death was caused by cardiac arrhythmia. *Clemons v. Alton & Southern R.R. Co.* (1977), 56 Ill. App. 3d 328, 370 N.E.2d 679.

Defendants' second contention is that the trial court erred when it permitted decedent's mother, Mrs. Mildred Mohler, to testify concerning a conversation she had with decedent. The testimony to which defendants object is as follows:

"[Plaintiff's Attorney]: Q. Now, at any time between that time and the time of his death, did you observe anything unusual about Skip?

A. Well, he was just—he didn't seem lively. He just seemed like he had something on his mind and he was just—he just wasn't like the old Skip.

Q. Do you recall any specific incidents during that period of time?

A. Well, he was going out on the road one night. It was early afternoon and he came in and I had just put a strip of metal between the carpeting and the kitchen. I had some linoleum put in the kitchen, and I put the screws in and I couldn't tighten them, so I said, 'Skip, would you tighten those screws for me,' and he took the screwdriver and he tightened all the screws and when he came up, why, he put his hands on his head and he said—I said, 'What's the matter?' And he said, 'Oh, that damned accident. Ever since then—'.

[Defense attorney]: I object to this testimony.

[The Witness]: And I said, 'Well, you better not go out on the road,' and he said, 'Well, I got to make this trip.'

The Court: Will you hold it, ma'am, just a minute? When a lawyer objects, that means I have to rule on that, so you—

[The Witness]: Oh.

The Court: —hold off any further conversation.

[The Witness]: Oh, fine.

The Court: Objection as to what has just transpired is overruled. It may stand."

Defendants argue that decedent's statements constituted hearsay and, therefore, were clearly inadmissible.

■■ Statements regarding the cause of an injury or condition are inadmissible (*Recklein v. Industrial Com.* (1929), 337 Ill. 37, 168 N.E. 671) unless made to a treating physician. (*Jensen v. Elgin, Joliet & Eastern Ry. Co.* (1962), 24 Ill. 2d 383, 182 N.E.2d 21; *Shell Oil Co. v. Industrial Com.* (1954), 2 Ill. 2d 590, 119 N.E.2d 224.) Therefore, decedent's statements made to his mother regarding the cause of his physical condition were inadmissible hearsay. However, we do not find this error warrants a new trial in this case. "When an appellant alleges prejudicial error in the admission of inadmissible hearsay, he alleges the admission probably or substantially controlled the result. 5 Callaghan's Illinois Evidence, 214 (1964)." (*Mehochko v. Gold Seal Co.* (1966), 66 Ill. App. 2d 54, 58-59, 213 N.E.2d 581.) We cannot say that the error in admitting the decedent's statements regarding the cause of his condition "probably or substantially controlled the result" in this case. Therefore, we find the error to be harmless.

Defendants' final contention is that plaintiff engaged in improper argument at closing which was so prejudicial as to require a new trial. Defendants argue that during plaintiff's rebuttal, plaintiff made arguments and inferences regarding Mohler's injury report, Mrs. Mohler's hearsay testimony, Mohler's work assignment and time book and the testimony of the railroad's brakeman Benoit and that none of these items of evidence were mentioned during plaintiff's initial closing argument. Defendants also note that during rebuttal argument plaintiff's counsel put before the jury for the first time "blow up" exhibits of pages in the time book which had not been introduced into evidence. The rule to be applied by the trial court was restated in *Enloe v. Kirkwood* (1970), 120 Ill. App. 2d 117, 256 N.E.2d 459, where the court stated:

"The rule governing review of assignments of error based upon alleged improper argument to the jury is clearly stated in Belfield v. Coop, 8 Ill. 2d 293, 134 N.E.2d 249. The character and scope of argument to the jury is left very largely to the trial court, and every reasonable presumption must be indulged in that the trial court has performed his duty and properly exercised the discretion vested in him. North Chicago St. R. Co. v. Cotton, 140 Ill. 486, 29 N.E. 899. The attitude and demeanor of counsel and the general atmosphere of the trial are observed by the trial court, and cannot be reproduced in the record on appeal. The trial court is, therefore, in a better position than a reviewing court to determine the prejudicial

effect, if any, of a remark made during argument, and unless clearly an abuse of discretion, its ruling should be upheld. *City of Chicago v. Chicago Title & Trust Co.*, 331 Ill. 322, 163 N.E. 17. * * *." 120 Ill. App. 2d 117, 123.

▮▮ Defendants themselves introduced the subject of Mohler's injury report and Mohler's work assignment and time book during their final argument. We note that defendants made no objection to the "damned accident" statement made by plaintiff in rebuttal. Furthermore, reference to the testimony of Benoit was proper rebuttal to the argument by defendants' counsel that the injury was insignificant. Defendants' objection to the use of the "blowup" exhibits was sustained, and plaintiff was precluded from using them. Under the circumstances of this case, we cannot say that the trial court abused its discretion. A new trial is not warranted here.

The judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

GOLDBERG and McGLOON, JJ., concur.

SUPPLEMENTAL OPINION ON DENIAL OF REHEARING

JUSTICE O'CONNOR delivered the opinion of the court:

Defendants have filed a petition for rehearing contending that the harmless error doctrine was wrongfully applied with reference to the exclusion of Dr. Leestma's testimony that he based his opinion as to Mohler's death in part on the report of Dr. Westfall.

Plaintiff has filed a petition for modification of the opinion contending (1) that this court incorrectly applied *People v. Ward* (1975), 61 Ill. 2d 559, 338 N.E.2d 171, to the above-mentioned testimony of Dr. Leestma and (2) that defendants' objection to the testimony of decedent's mother was waived because not properly raised or presented.

With reference to defendants' contention, we have carefully re-examined the record and find in it nothing to change our holding that the exclusion of Dr. Leestma's testimony was harmless.

With reference to plaintiff's contentions, we adhere to our application of the *Ward* case as to Dr. Leestma's testimony and, with reference to the testimony of decedent's mother, reaffirm our holding as to the harmless error in its admission, but agree with plaintiff that defendants' objection to it as hearsay was not specifically or properly raised at trial or sufficiently preserved in their post trial motion. *Johns-Manville Products Corp. v. Industrial Com.* (1979), 78 Ill. 2d 171, 179-80, 399 N.E.2d 606; *Wilson v. Clark* (1981), 84 Ill. 2d 186, 189-190, 417 N.E.2d 1322; *Brown v.*

*Decatur Memorial Hospital* (1980), 83 Ill. 2d 344, 348-53, 415 N.E.2d 337.
Defendants' petition for rehearing and plaintiff's petition for modification of the opinion are denied.

GOLDBERG and McGLOON, JJ., concur.