SCHOOL CITY OF HAMMOND v. MORIARTY

[No. 17,840. Filed April 14, 1949.]

208

*Hulbert & Marlatt,* of Gary, for appellant.

*Guy W. Slaughter;* and *Straley Thorpe* (of counsel), both of Hammond, for appellee.

ROYSE, P. J.—This is an appeal from an award of compensation by the Industrial Board of Indiana. In order to properly understand the questions presented, we believe it will be helpful to set out in some detail the facts as disclosed by the record.

At all of the times referred to herein Jesse M. Moriarty was an employee of appellant at the George Rogers Clark School. It was his duty on Saturday mornings to clean the dust from the top of two boilers in the boiler room of the school. These boilers were about five and one-half to six feet in diameter; the top was fourteen or fifteen feet above the concrete floor; they were about two and one-half feet apart. There were two blow-off valves on each boiler. These valves go off automatically if the steam pressure gets over twelve pounds. On the day involved herein the pressure of the boilers was four pounds. Each valve has an arm for releasing steam manually. To get to the top of these boilers decedent had to use a stepladder. In dusting the boilers he used a blower which was on the order of a vacuum cleaner. This blower when running makes a loud noise. On Saturday morning, May 3, 1947, decedent's immediate superior heard the blower running a little before 10:00 o'clock. It ordinarily took decedent ten or fifteen minutes to dust the boilers. The superior left the boiler room for about a half hour. When he returned the blower was still

running. He climbed to the top of the boiler and found decedent lying on his back on top of one of the boilers. He turned off the blower and sent for a doctor. A Dr. Rudser arrived in about fifteen minutes. The doctor pronounced decedent dead and assisted in lowering him to the floor. He said when he found decedent all of his back, back of head, back of thighs and legs, and part of the backs of his arms were in contact with the surface of the boiler. He could not determine how long he had been dead. He only made a superficial examination of the body. He found burns on the occipital at the back of the head and on the back of the buttocks. These burns were at points where decedent's body was touching the surface of the boiler. Dr. Rudser stated there is a difference in burns sustained before death and those sustained after death. He said: "In a burn in a living body, there would be considerable tissue reaction and unless there were a very deep burn there would be blistering or serum and segregation of the flesh with serum and in the event, however, it was very deep, third degree, there would be just charring and serum of the over-lying tissue, and if they were deeper, without the blistering and serum effect. As to burns after death, on a relatively shallow burn, there would be white or gray discoloration of the skin, without the raising up of the outside layers of the skin and blistering." It was his opinion the burns on decedent's body were post-mortem burns. The top of the boiler was insulated. There was a warmth or heat radiating from the boiler at the place where the body was lying. It was his opinion if a dead body were to lay on a boiler under the conditions existing on that day for a period of twenty minutes burns would result. He did not have an opinion as to the cause of decedent's death. He did not believe the shock from the burns

this man had would cause coronary occlusion. He said it was impossible to determine the cause of coronary occlusion without an autopsy.

A Dr. Carlo testified if he found a man with no evidence of burns on his clothing, yet when undressed he found second degree burns, there would be a possibility that the shock and burns caused death.

A factory inspector for the Indiana Bureau of Factory Inspection, who investigated the accident, described his findings as follows:

"I was notified of the fatality on May 3rd and went to the Coroner's and viewed the body. After making a careful check of the burns on the body, I felt it my duty to try to determine from what source they could have been obtained, so I went on Monday morning and made a very careful check of the boiler room and all its apparatus, trying to find its source where he got such severe burns. I found that Fred Krause was in charge of the maintenance of the boiler room. It was part of the man's duties to get on top of this boiler once a week. It was a cadillac type, 400 watt, 6 inch cycles, 110 volts, electric driven motor. There are two boilers classified as pop-off or hook-up. The top is about fourteen to fifteen feet from the concrete floor. It was necessary for me to use a stepladder which is about ten or eleven feet high. It was leaning against the side of the boiler and I started to climb up this ladder to the highest step and by reaching the steam pipe which is another two feet, where I reached overhead and secured a hand grip on the 'I' beam. I made an inspection of the top of the boiler where I was informed the body had been found. Underneath the 'I' beam are two safety valves. In order to get to the wide end of the boiler, it is necessary for one to stoop under this 'I' beam, which is five feet above the boiler. These two safety valves were the only two sources of receiving such a burn as I observed on the body of Moriarty. The burns must, obviously, have been received after being on top of said boiler. I made a test of the temperature at the

spot where his alleged body was found by sitting down, dressed only in a thin tweed suit, for ten minutes by my watch, and at no time was the temperature more than just a comfortable warmth. I had a thermometer with me and placed it directly on the boiler and it indicated 88° F. I held the back of my hands on the asbestos insulation covering the boiler three or four minutes and at no time was there any uncomfortable feeling due to heat. I found it difficult to stoop under this 'I' beam without coming into contact with the safety valves. They are of a mushroom type, four inches in diameter with a little lever that is used for the purpose of operating the valves by hand. The valve itself operates under a spring tension. The boiler carried four pounds pressure. I pressed down with a slight effort and opened both of these release valves. They do not require more than twelve to fifteen pounds pressure effort to open. The purpose of these two valves is that they may be manually opened to make sure the valve itself is in proper working order. There are two valves so that in the event one should become faulty, you have the second one to rely upon. The valves are six to eight inches apart, paralleling the boiler. It would be a very simple fact for one to fall on his back on top of these valves, which are uninsulated and in so doing cause a severe burn, besides pressing the two valve handles and opening the safety valve permitting hot steam and any hot water carried off by the escaping steam to burn any individual lying across them. I saw the body after death. There was one severe burn on the back of the head, another on the back of the shoulder blades down his back on his buttocks and on the calf of his left leg, and a severe burn on the right forearm. The burn on the arm was oval shape, such as one would obtain by coming in contact with a hot object about the size four inches in diameter, such as those valves. A certain watery liquid was coming out of the burns. They were ugly tan color and certain indications of blood from one of the more severe burns. They were wet burns. I have seen both wet and dry burns as a locomotive engineer. It was obvious that Moriarty's burns could come from nothing else but a steam burn. I didn't

examine his underwear. I examined his overalls and jacket for burns and didn't find evidence of a burn. . . ."

In answer to a hypothetical question he said:

"He apparently came to his death from shock from these severe burns.

"It would be possible for this hypothetical man to bump his head on this 'I' beam and come in contact with the valve to such extent as to open them and after he had fallen off them, they would close again from their own pressure. Moriarty could have been burned by steam from the valves by striking his head a severe blow on this 'I' beam and falling backward and throwing the levers in and lost his balance in stooping under the 'I' beam. . . .

"It is my theory that Moriarty fell on top these valves and blew out some steam and burned himself. The steam blows up from the valves. . . .

"It was impossible for any man to have received any burn other than by steam on top that boiler. I base my conclusion on the thermometer and sitting there without an uncomfortable feeling."

The mortician who prepared the body said when he undressed the body he discovered several bad burns thereon. He knew the coroner had a report that death was caused by coronary occlusion. He refused to embalm the body until the coroner made another examination. A Dr. Stecy, the deputy coroner who examined the body at the school, came to his place for another examination. The mortician said the burns were seeping, especially from the buttocks, and necessitated the application of cavity pads. He said these burns were not dry burns, but were burns from live steam. He has seen bodies that were burned after death and bodies where death was caused by burns. In his opinion decedent's burns were received while he was alive. He said after Dr. Stecy examined the body at

his place the doctor changed his report as to the cause of death from coronary occlusion to coronary occlusion due to second degree burns.

Dr. Stecy, basing his opinion on the examination of the body he made while acting as deputy coroner, said it was his opinion decedent died of coronary occlusion. He believed the burns were post-mortem. He said he could look at a body after death and fairly well tell whether death was caused by coronary occlusion without an autopsy. He did not make an autopsy although one was offered. His explanation on cross-examination as to the difference in his testimony before the Board and the report he made to the coroner was confusing and contradictory.

There was no evidence that decedent had been in ill health prior to his death.

Appellant contends the award in this case must be reversed because there is no substantial evidence that decedent's death was the result of an accidental injury and for the further reason there is no evidence appellee is a dependent under the provisions of the Indiana Workmen's Compensation Act.

Where an employee charged with the performance of a certain duty is found injured or dead at a place where it would be necessary for him to be in performing that duty, there is an inference that he was injured or died under circumstances indicating an accident arising out of and in the course of his employment. *Czuczko* v. *Golden-Gary Company, Incorporated* (1932), 94 Ind. App. 47, 55, 56, 177 N. E. 466, 179 N. E. 19 (Transfer denied) ; *Fisher* v. *City of Decatur et al.* (1935), 99 Ind. App. 667, 670, 192 N. E. 844; *Progress Laundry Company et al.* v. *Cook et al.* (1935), 101 Ind. App. 235, 198 N. E. 807; *Hunt et al.* v. *Gaseteria, Inc.* (1938), 105 Ind. App. 197, 201,

12 N. E. 2d 992; *National-Helfrich Potteries Co.* v. *Collar* (1939), 107 Ind. App. 225, 23 N. E. 2d 620. Of course, this inference may be rebutted by substantial evidence that the death was not so caused.

While it is true that a coroner's verdict as to the cause of death of an employee is not admissible in evidence in a proceeding to secure compensation for his death (*McCoy et al.* v. *General Glass Corporation* (1939), 106 Ind. App. 116, 120, 17 N. E. 2d 473) we know of no reason why the report of a physician who is a deputy coroner to his chief may not be used to impeach such physician if he subsequently gives a different version of the results of his examination.

Applying the foregoing rules to this case, it is undisputed appellant's decedent was found dead at a place where it was necessary for him to be in performing his duties and at a time when he would ordinarily be engaged in the performance of such duty. This was sufficient to establish a prima facie case in favor of appellee. While there was a sharp conflict as to whether the burns on his body were ante-mortem or post-mortem, there was no dispute that there is an ascertainable difference in the appearance of such burns. There was sufficient evidence to justify the Full Board in finding the burns on decedent's body were ante-mortem. Dr. Rudser, who admittedly made only a superficial examination of the body, did not know the cause of death, and did not believe the cause could be determined without an autopsy. It was his opinion the burns did not cause death. This was based on his belief they were post-mortem burns. Dr. Carlo believed there was a possibility the shock and burns would cause death. Both he and Dr. Rudser were of the opinion it would require

an autopsy to determine the existence or cause of coronary occlusion. The Industrial Board was the sole judge of the weight and credibility of the evidence of Dr. Stecy. We are of the opinion there was sufficient evidence to sustain the finding of the Board that decedent sustained an accidental injury arising out of and in the course of his employment, which injury resulted in death.

The record in this case discloses there is no evidence that appellee was the widow of decedent at the time of his death. To sustain the award it is incumbent on appellee to prove her dependency. There is no merit in her contention that the verified Form 10, which was her application for compensation, is evidence of this fact. It is apparent this was an inadvertent omission which appellee should have the opportunity to correct.

We are of the opinion the interests of justice require this case be remanded to the Industrial Board with instructions for further proceedings in accord with the views expressed herein. *McCoy et al.* v. *General Glass Corporation, supra; Cole* v. *Sheehan Construction Company* (1944), 222 Ind. 274, 53 N. E. 2d 172; *Heflin* v. *Red Front Cash & Carry Stores, Inc.* (1947), 225 Ind. 517, 75 N. E. 2d 662.

Reversed and remanded.

Draper, J. and Crumpacker, C. J.—Not participating.

NOTE.—Reported in 85 N. E. 2d 273.