**Arthur H. Blyzes, Plaintiff-Appellee, v. Midwest Towing Co., Inc., Defendant-Appellant.**

Gen. No. 67–104.

Fifth District.

March 27, 1969.

Rehearing denied May 12, 1969.

Bradley, Eaton, Jackman & McGovern, of Chicago, Burroughs, Simpson & Burroughs, of Edwardsville (Joseph V. McGovern and John M. Quigley, of Chicago, of counsel), for appellant.

Sandor Korein, Cohn, Cohn & Korein, of East St. Louis, for appellee.

MORAN, J.

Defendant appeals from a judgment of the Circuit Court of Madison County, Illinois, in favor of the plaintiff in an action to recover money damages for personal injuries.

Plaintiff was a deckhand on a towboat owned by the defendant, Midwest Towing Company, and on August 13, 1965, was working on a towboat which was in the process of tieing up two barges at St. Paul, Minnesota, when a line under strain slipped off a button and struck him on the bottom of the right foot. He suffered a fractured dislocation of the right ankle, which caused him to miss eight months of work. On September 20, 1965, he filed his complaint pursuant to the provisions of the Merchant Marine Act, 1920, 46 United States Code, section 688, commonly called the Jones Act, seeking recovery for the injury to his right foot, which was allegedly caused by defendant's negligence. The jury returned a verdict in favor of plaintiff and assessed the damages at $150,000. The trial court denied defendant's post-trial motion to set aside the verdict or grant a new trial and affirmed the verdict. We affirm.

Defendant first contends that the amount of the verdict is so grossly excessive that it requires a new trial or in the alternative, this court should order a substantial remittitur.

The evidence shows that the plaintiff earned $442 a month at the time of his injury and that he was unable to work for eight months and thus his lost wages were $3,536. He was 38 years of age and had a life expectancy of 33½ years. He has a seventh-grade education, had been working as a deckhand since 1945, and had been working for the defendant for the past seven years. A deckhand is a laborer who carries rigging weighing up to one hundred pounds, works in all kinds of weather, and is involved in activities requiring walking, climbing and jumping. Climbing and jumping are involved when going from an empty barge to a loaded barge, or vice versa. Plaintiff testified that there is a seven- to eight-foot difference in height from an empty barge to a loaded barge, and there is no other way to get from one barge to the other, except by climbing or jumping.

Immediately following the plaintiff's injury, he was placed under the care of Donovan L. McCain, an orthopedic specialist at St. John's Hospital in St. Paul, Minnesota. X rays taken after the accident indicated that plaintiff had a fractured dislocation of the right ankle, a fracture of the neck of the talus, a fracture of the medial malleolus, which is the inside of the ankle joint, and a portion of the tarsal bone had been driven out of the ankle joint into the back portion of the foot. The talus is the bone which separates the bones of the leg and the ankle and which articulates and allows for the motion up and down on flexion and extension of the foot. As a result of these fractures, there was a disturbance in the circulation of the blood to the foot. On August 13, 1965, plaintiff underwent surgery to reduce the fractures, wires were inserted into the ankle to hold the fractures in position and a cast was applied from the tip of the toes to the knee. On September 17, the wires were removed and x rays indicated the fractures were in the process of healing in excellent position. Before surgery was performed, the foot was a dusky color, but after the frac-

51

tures had been reduced, the normal color returned. Because plaintiff wanted to return to St. Louis, he was discharged on September 20, 1965, wearing a leg cast with a walking iron and using crutches. The doctor who performed the surgery testified that while plaintiff was in the hospital he was in considerable pain and was given pain medication. He also testified that the bones which were broken in the foot and ankle are the weight-bearing bones of the ankle and have to do with flexion and extension, which are the motions used in walking.

Plaintiff returned to St. Louis and on September 21, saw a Dr. O'Reilly, an orthopedic specialist to whom he had been referred by his attorney. Dr. O'Reilly took x rays, applied a shorter cast, and gave pain pills and medication for a skin irritation which had developed beneath the cast. On October 13, 1965, plaintiff was admitted to Lutheran Hospital in St. Louis under the care of a Dr. Kuhlman, the orthopedic consultant for the United States Public Health Service in St. Louis. When plaintiff was admitted to this hospital, he was suffering from a skin infection of the right foot and leg. He was treated with steroids and the skin condition improved. X rays showed a change in the density of the main part of the talus. This indicated asceptic necrosis (death of cells that lie in the bone) which is common in this particular bone after a serious fracture. Plaintiff was discharged from the hospital on October 30, 1965.

On November 29, 1965, Dr. Kuhlman removed the short leg cast and advised plaintiff to begin bearing weight on his foot. Plaintiff continued to see Dr. Kuhlman and the following indicates his progress on each visit: On December 29, 1965, he was putting all his weight on his right foot; on January 28, 1966, there was stiffness in the foot although he was able to squat in a deep knee-bend position; on February 28, 1966, he walked with a limp and the doctor recommended a heel lift for his shoe; on March 11, the swelling was gone, but he still had some

limp; on March 28, 1966, examination disclosed that he had about ten degrees up and down motion as opposed to a normal of ninety degrees, he had about five degrees inversion and eversion as opposed to a normal of fifty to seventy degrees, and he had minimal difficulties with pain. On March 28, Dr. Kuhlman released the plaintiff to return to work, testifying that whatever restoration was going to occur would have already occurred in the 7½ months since the injury. In the doctor's opinion plaintiff had reached the point where he would have more difficulty as a result of further immobilization or disuse of the ankle than he could expect to gain by such immobilization.

After his last visit with Dr. Kuhlman in March of 1966, plaintiff did not see a doctor until August 23, 1966, when he returned to Dr. O'Reilly for an examination that revealed he had about ten degrees of upward and downward motion on his ankle as compared to a normal of forty-five degrees. X rays showed that the fracture line through the talus was healing, but that there was a nonunion in the fracture line of the medial malleolus; also, the x rays indicated some loss of cartilage between the tibia and the talus which indicates the presence of traumatic arthritis in the ankle joint. Plaintiff did not see a doctor again until March 28, 1967, when he was examined by Dr. O'Reilly shortly before the trial. X rays showed that the blood supply to the talus was being restored and that it could eventually be completely revascularized; that there was a general improvement in the blood circulation in the foot; that there was a nonunion of the fracture of the medial malleolus and a narrowing of the joint space of the ankle.

Plaintiff returned to his job as a deckhand on April 20, 1966, and worked for the defendant until the fall of 1966 when defendant shut down its operations for the winter. Plaintiff was then referred by his union to Mississippi Valley Barge Line. At Mississippi, he was re-

quired to take a physical examination by a company doctor. On cross-examination plaintiff stated that he was denied employment at Mississippi Valley because of his ankle. Plaintiff was then referred to F. S. Towing Company who hired him for twenty-one days, but they did not require a physical examination, nor did they inquire about plaintiff's ankle. Plaintiff then returned to his regular job as a deckhand for the defendant when defendant resumed its normal operations in February of 1967. At the time of the trial plaintiff was on his regular thirty-day off-period and was scheduled to return to work for the defendant within a few days after the trial.

Dr. O'Reilly testified that until the blood supply to the talus is normal, it can collapse and become flattened and cause pain and loss of motion in the ankle joint. Both Dr. O'Reilly and Dr. Kuhlman testified that the plaintiff has a limitation of up and down motion of the foot due to the narrowing of the joint space (ten degrees as compared to ninety degrees normal) and a limitation on turning the foot in and out, due to scarring around the small bones of the foot and the joint between the talus and the heel bone (five degrees as compared to a normal of fifty- to seventy-five degrees). Both doctors also testified that the limitation of motion is a permanent and static condition. Dr. O'Reilly testified that the condition of the ankle will become worse because of the progressive changes of the traumatic arthritis; that plaintiff should not engage in employment requiring jumping, climbing and long periods on his feet; and that his pain and limp are permanent and could become worse due to arthritis. Plaintiff testified that when he resumed his regular job, he had problems in that he could not keep up with his fellow workers because of the limp, and that he has never been free of pain since the injury.

In the recent case of Grunenthal v. Long Island R. Co., 393 US 156, 21 L Ed2d 309, 89 S Ct 331, the plaintiff who sustained a severely crushed foot as a result of an acci-

54

dent sued the defendant under the Federal Employers' Liability Act, 45 USC, par 51 et seq., and the jury in the District Court for the Southern District of New York awarded him $305,000. The trial court denied the railroad's motion to set aside the award as excessive, but on appeal the Circuit Court of Appeals for the Second Circuit ordered a new trial unless the plaintiff would agree to remit $105,000 from the award.

In reversing, the United States Supreme Court pointed out that the trial judge had filed an unreported opinion in which he detailed the items of evidence which in his view were sufficient to support the jury in finding that "(1) wages lost before trial amounted to approximately $27,000 (2) loss of future wages based on petitioner's present salary of $6,000 per annum plus likely increases over a life expectancy of 27.5 years would amount to $150,000 present value, and (3) 'an amount approaching $150,000 (would be appropriate) for plaintiff's pain and suffering—past and future.' "

In discussing the trial judge's finding as to pain and suffering, the United States Supreme Court said:

> "Since the jury's award for the lost future earnings may properly have been as high as $150,000, its award for pain and suffering might have been as low as $128,000 rather than the $150,000 deemed permissible by the trial judge. In any event we cannot say that the trial judge's opinion that the jury might have awarded the higher $150,000 amount is without support in the record."

■ ■ The courts of review in this state have also repeatedly held that the assessment of damages is primarily a question of fact for the jury and that an appellate court should not substitute its judgment for that of the jury's as to the amount to be awarded in a given case. Lau v. West Towns Bus Co., 16 Ill2d 442, 158 NE2d 63; Wells v. Gulf, M. & O. R. Co., 82 Ill App2d 30, and cases cited therein.

■ Considering the life expectancy of the plaintiff, the rigors of his employment, and the nature and extent of his injuries, the jury could have concluded that his capacity to earn money in the future would be severely impaired and that he had suffered and would continue to suffer great pain in the future. Under the standards of our courts of review and the standard set forth in Grunenthal v. Long Island R. Co., supra, we are unable to say that the award of the jury is so grossly excessive as to require a new trial or remittitur.

■■ Defendant next contends that the court erred in orally instructing the jury that the plaintiff had no duty to advise his coemployee of an unsafe condition which resulted in plaintiff's injury. During cross-examination, the plaintiff was asked whether he had told the watchman on the barge about the improper placement of the line which was being used to tie up the barges. Plaintiff's attorney objected to this question on the grounds that plaintiff did not have a duty to say anything to the watchman and that the question inferred such a duty. The court overruled this objection, but told the jury that no inference was to be drawn from any answer that it was plaintiff's duty to advise his co-employee. Plaintiff then answered that he did not tell the watchman about the improper placement of the line. Defendant's attorney continued with his cross-examination without raising any objection to the judge's remarks. Unless proper and timely objection thereto has been made in the trial court, an objection based on the improper remarks of the trial judge cannot be raised on appeal. County of Cook v. Holland, 3 Ill2d 36, 119 NE2d 760; Public Service Co. v. Leatherbee, 311 Ill 505, 143 NE 97; Manning v. Kennedy, 320 Ill App 11, 49 NE2d 658.

■ Defendant next contends that the court erred in refusing to grant defendant's motion for a new trial on the grounds that the verdict was based on improper, speculative and conjectural medical testimony. It is con-

tended that the testimony of Dr. O'Reilly as to the degree of recovery and the existence of any disability was speculative and conjectural. Having examined the record, we find that defendant's counsel did not object to such testimony or ask that it be stricken from the record of the trial court. This issue was not raised until defendant submitted his post-trial motion, which was denied. Since the defendant did not make timely objections, he has not preserved his objections for review. Department of Public Works and Buildings v. Todaro, 90 Ill App2d 245, 233 NE2d 61. A party will not be permitted to raise objections to evidence in an appellate court which were not urged in the trial court. Libbra v. Mt. Olive & Staunton Coal Co., 29 Ill App2d 396, 172 NE2d 813.

█ Defendant also contends that the trial court committed reversible error in giving plaintiff's instruction No. 1 which was not in IPI and which reads as follows:

> "As used in these instructions, proximate cause means any negligence on the part of the employer which plays any part, even the slightest, in producing any injury to plaintiff."

Defendant argues that this instruction goes beyond the plain meaning of the statute and that it was argumentative and confusing. In DeLima v. Trinidad Corp., 302 F2d 585, the U. S. Court of Appeals for the Second Circuit held that it was error for the trial court to refuse an instruction in language identical to plaintiff's instruction No. 1:

> "Since the language of the requested charge was taken directly from Rogers v. Missouri Pac. R. Co., 352 US 500, 506, 77 S Ct 443, 1 L Ed2d 493 (1957), a decision which reflects the Supreme Court's view that the Federal Employers' Liability Act, 45 USCA Sec 51 et seq. and the Jones Act are departures from traditional common law principles, we believe the

57

requested charge should have been given. See also Ferguson v. Moore-McCormack Lines, Inc., 352 US 521, 523, 77 S Ct 459, 1 L Ed2d 515 (1957)." Ibid.

Defendant also argues that since IPI instruction No. 160.02 is recommended for use in all FELA and Jones Act cases and since this instruction was given at the request of the plaintiff, it was a violation of Illinois Supreme Court Rule 239(a) [1] to also give plaintiff's instruction No. 1. IPI instruction No. 160.02 does not contain the definition of proximate cause as established by DeLima and the United States Supreme Court decisions cited therein. Therefore, the trial court did not err in giving plaintiff's instruction No. 1, for in cases construing the FELA and the Jones Act the decisions of the United States Supreme Court must be followed. Bowman v. Illinois Cent. Railroad, 11 Ill2d 186, 142 NE2d 104.

█ Finally, the defendant contends that the trial court erred in giving plaintiff's instruction No. 3 because it failed to advise the jury of the affirmative defense contained in defendant's instruction No. 9 which reads:

"If you find that plaintiff was negligent, and you find that his negligence was the sole cause of his injury, he may not recover."

Defendant did not make this objection to plaintiff's instruction No. 3 during the instruction conference and therefore we will not consider it here. Saunders v. Schultz,

---

[1] "(a) Use of IPI Instructions; Requirements of Other Instructions. Whenever Illinois Pattern Jury Instructions (IPI) contains an instruction applicable in a civil case, giving due consideration to the facts and the prevailing law, and the court determines that the jury should be instructed on the subject, the IPI instruction shall be used, unless the court determines that it does not accurately state the law. Whenever IPI does not contain an instruction on the subject on which the court determines that the jury should be instructed, the instruction given on that subject should be simple, brief, impartial and free from argument."

20 Ill2d 301, 170 NE2d 163; Onderisin v. Elgin, J. & E. Ry. Co., 20 Ill App2d 73, 155 NE2d 338. Therefore, the trial court did not err in giving plaintiff's instruction No. 3 to the jury.

For the foregoing reasons, the judgment of the trial court is affirmed.

Judgment affirmed.

GOLDENHERSH and EBERSPACHER, JJ., concur.