RAYMOND McINTYRE, Plaintiff-Appellee, *v.* WOOD RIVER TOWING COMPANY, Defendant-Appellant.

Fifth District    No. 74-346

Opinion filed April 7, 1976.

John C. Shepherd, of Coburn, Croft, Shepherd & Herzog, of St. Louis, and James D. Edgar, of Webster Groves, for appellant.

Cohn, Carr, Korein, Kunin and Brennan, of East St. Louis (Rex Carr, of counsel), for appellee.

Mr. JUSTICE GEORGE J. MORAN delivered the opinion of the court:

Defendant appeals from a judgment of the circuit court of Madison County which denied its post-trial motion for a new trial in a case wherein plaintiff sued under Title 46 U.S.C.A. § 688, commonly called "The Jones Act," and the general maritime law of the United States.

Defendant contends it is entitled to a new trial because (1) the trial court improperly instructed the jury that the evidence in the case failed to show contributory negligence as a matter of law; (2) the court erred in admitting into evidence subjective findings and complaints from a Dr. Robert Lam and a Dr. George Schoedinger, III; and (3) the trial court improperly sustained plaintiff's objection to impeachment of plaintiff on a 1963 felony conviction.

The plaintiff, Raymond McIntyre, was injured in September, 1970, while working for the defendant as a mate. At the time of the injury, the defendant's tugboat, the N/V DAN C, was moving a 12-barge tow through Lock 26, which is located on the Mississippi River at Alton, Illinois. The Dan C and its tow were headed downriver, and to continue downriver, it became necessary to maneuver the vessels through the Alton Lock. The general procedure for passing through the lock required the Dan C to push the entire tow into the lock. The tow was then divided into two parts or cuts because the tow was too large to pass through the lock as one unit. After dividing the tow, the Dan C reversed its direction and pulled half of the tow back out of the lock. The lock gates were then closed and the water level inside the chamber lowered to the level of the lower Mississippi River. Normally, the cut within the lock chamber would then be pulled through and out of the chamber by use of an electric winch. Having been pulled through the chamber, the lock gates would be opened, the cut would be disconnected from the winch and would be moved down between two retaining walls by the force of the current.

Members of the crew aboard the cut would then throw a line around one of several 4″ long and 3″ diameter steel pegs imbedded in the retaining walls. The other end of the line would be figure-eighted around a cleat on the side of the barges and by alternately tightening and slackening the line the barges would be brought to a stop alongside the retaining wall. The procedure would then be duplicated for the second cut. The cuts would be recoupled and proceed downriver.

When the tow was divided into two parts, so was the crew. The personnel assigned to the first cut consisted of the plaintiff McIntyre, the mate who was to pilot the tugboat Maud, and two deckhands. Of the two deckhands, Hutcheson had more experience having joined the tow about two weeks previously. The other deckhand, Wallace, had only about two hours' experience. On this particular occasion, therefore, the captain of the Dan C decided not to utilize the electric winch because of a lack of sufficient manpower to stop the barges with lines after the winch had been disconnected. Instead of using the winch, the plan was to have a smaller tugboat, the Maud, pull the barges out of the lock chamber.

The tow having been divided, the first cut moved through the lock chamber. As the first cut was moving down between the retaining walls, both engines on the Maud apparently died. McIntyre radioed this information to the captain on the Dan C. The captain told him to attempt to restart the engine or try to catch a line. McIntyre called out to the two deckhands to catch a line. The deckhands, Wallace and Hutcheson, attempted several times to do so but were unsuccessful due to their lack of experience. The line repeatedly missed the pin and was dragged through the water. Meanwhile, McIntyre was attempting to restart the Maud's engines. When he was unable to do so, he left the Maud and went onto the barges to attempt to catch a line. By this time, the Maud and the barges were nearing the end of the retaining walls and the current was beginning to take the two out into the river. McIntrye threw a line and hit the very last of the steel pegs on the longer of the two retaining walls. The eye of the line looped around the peg and McIntyre wrapped the other end of the line twice around the cleat on the side of the barge. At this point there is some conflict in the testimony of McIntyre and Hutcheson as to exactly what happened. Hutcheson testified that the steel pin turned and bent. McIntryre did not see the steel pin bend or turn. At any rate, the line took the strain and popped off the peg. When it popped off the peg, it apparently sprang back and knocked McIntyre down injuring his back. McIntyre then grabbed another line and threw it around the piling. The line caught and the barge stopped.

McIntyre left the tow when it reached St. Louis and entered a hospital. In the ensuing months, plaintiff McIntyre contacted several physicians in connection with his back injury. The pertinent details of that treatment

history will be discussed in connection with that portion of this opinion relating to defendant's contention of improper admission of certain medical testimony.

In October of 1970, the plaintiff instituted this action alleging that the defendant was negligent or its vessel was unseaworthy, or both. The complaint alleged that defendant failed to provide a reasonably safe place to work, failed to keep its engines in adequate and proper condition to operate and failed to provide plaintiff with sufficient and adequate help with which to perform his work.

At the trial, plaintiff testified that there had been recurrent problems with the engines of the Maud throughout the summer of 1970. These engine problems had been communicated to the chief engineer and the captain of the Dan C. Plaintiff testified that he, the chief engineer and the captain had relayed this information to the owners of the boat and that they had promised to deliver the needed parts. No repairs, however, were made to the Maud prior to this incident. According to the testimony of plaintiff McIntyre and of the deckhand Hutcheson, the plaintiff had no responsibility for the upkeep or repairs of the engines. Defendant offered no evidence to the contrary. At the trial, plaintiff also testified that he had complained to the captain about the lack of experienced manpower and that this complaint had been radioed to the company office.

At the conclusion of the proceedings, plaintiff's attorney submitted a peremptory instruction requesting the trial court to remove the issue of contributory negligence from the jury. The trial court granted plaintiff's request over the vigorous objection of the defendant.

It is undisputed that the burden of proving contributory negligence in this case rested on the defendant and that contributory negligence, even if proved, would not bar plaintiff's recovery but would only diminish the damages due him.

At the instruction conference, the defendant argued that plaintiff had been negligent in (1) failing to fulfill his duty as mate and pilot of the Maud to inspect the Maud's engines, (2) failing in his responsibility as the deckhands' supervisor to instruct the deckhands as to how to throw a line, (3) failing in his responsibility to select the proper line, (4) waiting too long to take action in catching a line after the Maud's engines quit, and (5) handling the line incorrectly.

There is no evidence that plaintiff failed in his duty to inspect the Maud's engines because there is no evidence that plaintiff had such a duty. The only evidence in the record relating to the engines of the Maud reveals that plaintiff had no responsibility for the upkeep and maintenance of the engines and that defendant fully informed the appropriate authorities of mechanical difficulties with the engines.

There is no evidence in the record that plaintiff failed in his

responsibility to instruct the deckhands as to how to throw a line. First, there is no clear evidence that plaintiff had such a responsibility. Plaintiff did testify that when Wallace boarded the boat the owner of the boat had asked him to "help him [Wallace], try not to let him get hurt out there." Wallace, however, had only boarded the boat two hours before the incident. Furthermore, it should be remembered that the captain of the Dan C had recognized the inexperience of the crew and had, therefore, decided to have the towboat Maud pull the barges out of the lock chamber. It was only because of the malfunctioning of the engines of Maud that the deckhands were called upon to attempt to throw a line over a peg.

The third allegation of the defendant, that plaintiff failed in his duty to select the proper line, appears equally without merit. In an affidavit, the owner of the boat asserts that the mate, the plaintiff, had the responsibility for selection of the type of line to be used in the docking procedure. The question of the type of line used became a major question during the examination of the plaintiff. It is somewhat difficult to determine why this was so. Apparently, there were two types of lines available, manila and poly (polyester). Deckhand Hutcheson testified that manila lines were being used that day. Hutcheson expressed a preference for poly lines because they were less likely to swell up and pop when wet. During examination, plaintiff vacillated as to whether manila or poly lines were being used that day and which type of line he preferred. The end result of plaintiff's testimony appeared to be that poly lines were being used that day and that he preferred poly line for his own use but manila line for use of less experienced men. The preference for manila line for less experienced men had nothing to do with the relative difficulty in hitting a pin with the line. Thus even if plaintiff had responsibility for selection of the line and even if plaintiff did select the "wrong" line in light of the situation, it made no difference. The inexperienced deckhands never hit a pin with the line anyway. For plaintiff's own attempt at hitting the pin, plaintiff had available the stronger of the two lines, the poly line. Nevertheless, the eye of the line popped off the steel pin.

Defendant's fourth allegation is that plaintiff waited too long to take action in catching a line after Maud's engines quit. Once again we find no support for this contention in the record. We also attach no significance to the existence of alternate reasonable courses of action unless there is some showing that the course of action pursued was unreasonable.

The final allegation of the defendant, that plaintiff handled the line incorrectly finds some minimal support in the record. Plaintiff did testify that he wrapped the line around the cleat twice. Plaintiff did testify that this was "not enough." Further testimony of the plaintiff does, however, indicate that the two wraps were insufficient only in light of the speed of

the barges at that time. The speed of the barges resulted from the inability to control the barges because of the failure of the Maud's engines, and the inexperience of the deckhands.

■■ In our opinion there is no evidence in the record to support a finding of contributory negligence by the jury. Therefore the trial court properly removed this issue from the jury's consideration.

The defendant also contends that the court erred in admitting into evidence the testimony of Drs. Schoedinger and Lam, two physicians who examined the plaintiff following the incident. Defendant contends that these doctors did not examine the plaintiff for the purposes of diagnosis and treatment but rather for the purpose of testifying and that any diagnoses by them based on and testimony relating to subjective symptoms of the plaintiff should have been inadmissible.

The facts of plaintiff's treatment history may be briefly stated. Immediately after the accident, plaintiff entered a hospital in St. Louis and came under the care of Dr. Kuhlman. Plaintiff remained in traction in the hospital for four or five days. Plaintiff then went to a New Orleans hospital and underwent physical therapy. After release from the New Orleans hospital, plaintiff visited the out-patient clinic of a St. Louis hospital every other day for two weeks. In the spring of 1971, plaintiff was admitted to a hospital in Cape Girardeau. Under the direction of a Dr. Ohler, plaintiff there underwent more traction and general therapy. In December of 1971, plaintiff first contacted Dr. Schoedinger, an orthopedic surgeon, after having asked his lawyer to recommend a doctor. Dr. Schoedinger took the patient's history and conducted physical, neurological and orthopedic examinations. He also obtained x-rays of the plaintiff and directed an associate, Dr. Moon, to perform an electromyogram on the plaintiff. On the basis of all of these tests, plaintiff's condition was diagnosed as a herniated nucleus pulposus. Dr. Schoedinger's principal recommendation to the plaintiff was disc surgery. In 1973, plaintiff asked his attorney to recommend another doctor. This time plaintiff was directed to Dr. Lam, a neurologist and psychiatrist. Dr. Lam took plaintiff's history and conducted a neurological examination of the plaintiff with emphasis on the back and lower extremities. Dr. Lam did not take x-rays of the plaintiff nor perform a myelogram or discogram on the plaintiff. Plaintiff's condition was diagnosed as a nucleus pulposus abnormality. Dr. Lam's principal recommendation to the plaintiff was to continue the existing medical course of antispasmodics, leg traction, a corset and limitation of motion.

■■ We agree with the defendant that the test for the admissibility of medical testimony and diagnoses based on subjective symptoms is "whether the examination is made for the purpose of trial or for treatment" (*Bowman v. Illinois Central R.R. Co.*, 11 Ill. 2d 186, 214, 142

N.E.2d 104). We cannot agree, however, that defendant has demonstrated that either Dr. Lam or Dr. Schoedinger should be characterized solely as examining physicians.

The mere fact that the plaintiff was directed to these doctors by his attorney does not automatically indicate that their examinations of the plaintiff were conducted for the purposes of preparing trial testimony (*Conway v. Tamborini*, 68 Ill. App. 2d 190, 196, 215 N.E.2d 303; *Shell Oil Co. v. Industrial Com.*, 2 Ill. 2d 590, 602, 119 N.E.2d 224, 231). Dr. Schoedinger stated unequivocally that he examined plaintiff for the purposes of treatment. His statement to this effect was not challenged by the defendant directly or indirectly. During examination, Dr. Lam stated that he also saw plaintiff for the purposes of diagnosis and treatment. Cross-examination of Dr. Lam arguably did reveal some information suggesting that plaintiff had been seen by Dr. Lam for purposes other than diagnosis and treatment. Thus, it was established that Dr. Lam was sent records of the plaintiff by plaintiff's attorney, that Dr. Lam had examined other persons for plaintiff's attorney and that Dr. Lam made an oral report on plaintiff's condition to the attorney.

■■ We do not determine whether this information established that Dr. Lam's examination was conducted solely for purposes of trial. We need not reach this decision because there appears to be no substantial material in the testimony of Dr. Lam that was not introduced by way of the testimony of Dr. Schoedinger. The testimony of the two doctors was the same in terms of symptomology, diagnosis and prognosis. In that situation, even if it was error to admit the testimony of Dr. Lam, the error was not reversible because the testimony was merely corroborative of properly admitted testimony, *Korleski v. Needham*, 77 Ill. App. 2d 328, 336, 222 N.E.2d 334; *Becherer v. Best*, 74 Ill. App. 2d 174, 181, 219 N.E.2d 371.

To support its contention that the medical testimony of Drs. Schoedinger and Lam was improperly admitted, the defendant relies solely on *Jensen v. Elgin, Joliet & Eastern Ry. Co.*, 24 Ill. 2d 383, 182 N.E.2d 211. The situation in *Jensen*, however, is not controlling of that in the present case. A more detailed exposition of the testimony of the questioned physician in that case is set out in *Jensen v. Elgin, Joliet & Eastern Ry. Co.*, 15 Ill. App. 2d 559, 147 N.E.2d 204. In *Jensen*, the Illinois Supreme Court considered the subjective nature of the symptoms related to the doctor and the failure of the doctor to utilize x-rays, a myelogram or a discogram (24 Ill. 2d 383, 388). The basis for the appellate and supreme courts' conclusions that the testimony was inadmissible, however, appeared to be independent evidence introduced into the record to the effect that the patient in relating his symptoms to the doctor and the doctor in preparing his report did so for the principal purpose of

trial (24 Ill. 2d 383, 389). In the present case, there is no evidence in the record to support such a finding. In addition, it should be noted that the excluded medical testimony in *Jensen* was not corroborated by any other properly admissible testimony.

■■ Defendant finally contends that the trial judge improperly excluded from evidence the records of plaintiff's 1963 conviction for the crime of uttering. The present case was tried in April of 1974. Eleven years prior to that, in January of 1963, the plaintiff was convicted of uttering a fraudulent check and served six months in a prison in Missouri in 1963 for that offense. The court, in its discretion, held that the 11-year-old record of this conviction should not be admitted into evidence. The court's action was proper under *People v. Montgomery*, 47 Ill. 2d 510, 268 N.E.2d 695, and *People v. Ray*, 54 Ill. 2d 377, 297 N.E.2d 168.

For the foregoing reasons, the judgment of the circuit court of Madison County is affirmed.

Judgment affirmed.

KARNS and EBERSPACHER, JJ., concur.