JACK BALDWIN, Plaintiff-Appellee, *v.* HUFFMAN TOWING COMPANY, Defendant-Appellant.

Fifth District   No. 76-449

Opinion filed August 4, 1977.

Michael D. O'Keefe, of Thompson & Mitchell, of East St. Louis, for appellant.

Sandor Korein and David J. Letvin, both of Cohn, Carr, Korein, Kunin and Brennan, of East St. Louis, for appellee.

Mr. PRESIDING JUSTICE CARTER delivered the opinion of the court:

The plaintiff, Jack Baldwin, was injured on April 21, 1973, while employed as a deckhand on the M/V Lady Slipper, a towboat belonging to defendant. The injury occurred while he was attempting to secure the tow and its barges to a lock wall at Lock and Dam 26 at Alton, Illinois. While attaching the line to a lock wall the boat moved suddenly, and plaintiff's hand, which was caught in the line, became severely injured. Plaintiff brought a suit pursuant to the Jones Act (46 U.S.C. §688 *et seq.*) After a trial by jury on October 20, 1975, the jury assessed damages for

plaintiff in the amount of $225,000. The court entered a judgment on the verdict. Post-trial motions were filed and denied.

Defendant raises four issues on appeal. (1) Whether the court erred in granting plaintiff's motion *in limine* to exclude from trial any reference to plaintiff's conviction for unlawful possession of narcotics, heroin. (2) Whether the court erred in instructing the jury that it was their duty to ascertain the present cash value of plaintiff's damages, if any, without giving an instruction explaining how to determine "present cash value." (3) Whether the court erred in failing to submit defendant's special interrogatory to the jury. (4) Whether the verdict was excessive.

Prior to trial plaintiff made a motion *in limine* requesting the court to order defense counsel to refrain from making any reference at trial to plaintiff's prior conviction for unlawful possession of narcotics. The conviction, which was entered on April 28, 1971, was a felony under the laws of the State of New York. Plaintiff alleged that the prejudicial effect of introduction of such evidence would far outweigh the impeachment value. Defendant argued that the conviction met the criteria for admissibility of convictions for impeachment of credibility as set forth in *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695, and that the court should exercise its discretion by allowing the defendant to use plaintiff's conviction for impeachment purposes. The court granted the plaintiff's motion and ruled that the probative value of plaintiff's conviction for possession of narcotics did not outweigh its prejudicial effect.

■■ Our legislature has provided in section 1 of "an act in regard to evidence and depositions" (Ill. Rev. Stat. 1975, ch. 51, par. 1) that a witness' prior conviction can be used in a civil suit to impeach that witness' credibility. The conviction is not admissible unless it is for a crime punishable by death or imprisonment in excess of one year under the law under which he was convicted or involved dishonesty or false statements regardless of the punishment. In either case, the trial judge must determine whether or not the probative value of the evidence of the crime is substantially outweighed by the danger of unfair prejudice. Further, evidence of the conviction is not admissible if a period of more than 10 years has elapsed since the date of conviction or of the release of the witness from confinement, whichever is the later date. (*People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695). The *Montgomery* standards are applicable to civil actions. (*Knowles v. Panopoulos* (1977), 66 Ill. 2d 579, 363 N.E.2d 805; *McIntyre v. Wood River Towing Co.* (5th Dist. 1976), 37 Ill. App. 3d 488, 346 N.E.2d 420.

■■ We must decide whether the trial court abused its discretion in denying the defendant the opportunity to use plaintiff's 4½-year-old conviction for possession of dangerous drugs, heroin. Evidence taken

from plaintiff at the hearing on the motion *in limine* indicates that plaintiff had stopped his illegal narcotics use by July 1971, and that he had the consent of the New York Narcotics Addiction Control Commission to leave New York although he was originally sentenced to their supervision for 60 months. Pursuant to the court's inquiry, defendant's counsel stated that there was nothing in pretrial discovery nor any evidence that plaintiff was under the influence of narcotics at the time his injury was sustained. In view of the fact that narcotics addicts are notorious liars (*People v. Lewis* (1962), 25 Ill. 2d 396, 185 N.E.2d 168; *People v. Perez* (1968), 92 Ill. App. 2d 366, 235 N.E.2d 335) and that many people believe that once a user or addict always a user or addict, we conclude, as did the trial court, that the prejudicial effect of the evidence of plaintiff's conviction for possession of a dangerous drug, heroin, far outweighs the probative value it would have in determining plaintiff's credibility.

■■ Defendant contends that the court erred in refusing to instruct the jury on a certain special interrogatory submitted by defendant. However, defendant failed to preserve this issue, because he did not include it in his post-trial motion. Issues not included in post-trial motions are deemed waived. (*Lopez v. Galeener* (5th Dist. 1975), 34 Ill. App. 3d 815, 341 N.E.2d 59.) Therefore, we will deem this issue waived and will not consider it.

■■ Defendant contends that the court erred in instructing the jury on their duty to ascertain the present cash value of plaintiff's damages, if any, arising in the future due to injuries or loss of future earnings in the absence of any evidence on how to compute present cash value. However, defendant waived this point by failure to include all jury instructions, given and refused, in his abstract. Failure to abstract all instructions waives alleged error in instructing the jury. (*Kapelski v. Alton & Southern R.R.* (5th Dist. 1976), 36 Ill. App. 3d 37, 343 N.E.2d 207.) Defendant's abstract contains only four verbatim jury instructions and the two verdict forms. The other instructions are only referred to by the page of the record on which they appear, the party submitting the instruction, and whether it was given or refused. The number of the Illinois Pattern Jury Instruction is not even given.

Defendant lastly contends that the jury's assessment of damages at $225,000 is excessive. Evidence on which the jury had to base its assessment of damages is as follows. Plaintiff is 29 years old and has a life expectancy of 41.9 years. Plaintiff had earned $554.50 while employed by defendant for the 22 days of employment. He had worked as a forklift driver, truck driver, dishwasher, and cook prior to the injury. He is right-handed. He only worked for two months in 1972 and for approximately six months in 1971. Since the accident, plaintiff worked at a gasoline station for a couple of hours. Another job required him to pick up garbage

as a member of a garbage crew. Although he could only use his left hand as his right hand could not hold onto the garbage bags, he continued working as long as work was available. He then worked cutting tobacco with a knife for approximately one month. He used his right hand until it started hurting him at which time he would continue cutting tobacco with his left hand. Prior to trial, plaintiff had been employed as a truck driver in which he drove a standard shift two-ton truck. He used only his left hand to steer, because he could not grip the steering wheel with his right hand. Plaintiff had applied for jobs with a tile plant and trucking concern.

After suffering the injury, plaintiff spent six weeks in Barnes Hospital, St. Louis, Missouri. Dr. Arthur H. Stein, Jr., an orthopedic surgeon, whose evidence deposition was read into the record, was plaintiff's attending physician. Dr. Stein first saw plaintiff five days after the accident, on April 26, 1973. An examination of plaintiff's hand revealed dead muscles on the palm of the hand, particularly in the region of the thumb. The muscles in the base of the thumb were dead due to crushing. The nerves and arteries in the fingers were found to be functioning. Surgery was performed to remove dead tissue. On April 30, 1973, another operation was performed to remove other dead tissue and clean the wound. Plaintiff sustained a fracture of a joint at the very base of the thumb at the level of the wrist when he was injured. On May 4, 1973, plaintiff underwent surgery for a third time in order to remove more dead tissue around the thumb. During the operation, Dr. Stein observed that the nerve which supplies sensation to the index finger had died. On May 8, 1973, for the first time, there was no dead tissue, and the hand was free of pus. Skin from plaintiff's thigh was grafted onto the entire defect in plaintiff's palm. Nothing could be done to replace the destroyed muscle. On May 25, 1973, plaintiff was discharged from Barnes Hospital.

On August 13, 1973, after examining plaintiff and determining that plaintiff had regained sufficient function in his fingers, Dr. Stein decided to operate, which was agreeable with plaintiff, in an attempt to move the thumb away from the side of the hand. On September 17, 1973, Dr. Stein removed all the scar which tended to bind the thumb against the index finger. A skin graft, which was 3 3/4″ in length and 3″ in width, was taken from the abdonimal area. Plaintiff was bandaged "so that his hand was sutured or sewn onto his stomach and bandaged in such a manner that he would stay that way for three weeks and couldn't move or wriggle around so that he got things loose." On October 8, 1973, Dr. Stein operated on plaintiff in order to free his hand from his abdomen. The skin graft healed satisfactorily and plaintiff was discharged on October 24, 1973. When plaintiff was examined on November 20, 1973, he was fitted with a night-splint which he wore at night to prevent the thumb from getting into an undesirable position. On August 14, 1974, a tendon transfer was

performed on plaintiff's hand in order that plaintiff might obtain better gripping use in his hand.

Dr. Stein examined plaintiff for the last time on October 16, 1974. By that time plaintiff had regained reasonably good flexion and extension on three of his fingers. The little finger of the injured hand had shown little improvement. Plaintiff experienced a significant loss of gripping power in his right hand and loss of some of the fine motion of the hand which he would need to manipulate small objects in the hand. Due to the skin grafts, plaintiff suffered some loss of feel in the palm of his hand. Dr. Stein concluded that he could do no more in restoring plaintiff's hand. Although plaintiff could make a fist, he could not tightly clench it. Although plaintiff is able to move his thumb around and pick up objects with the index, long, and ring fingers, he had difficulty with the ring and little fingers. If plaintiff's hand became infected in the area of the skin grafts, he would feel little pain until the infection became pretty severe.

Dr. Stein was of the opinion that plaintiff could drive an automobile, a tractor, and a forklift. Plaintiff could do some carpentry and welding work, but he could not do tasks that require fine motions with his injured hand.

Dr. Max Goldenberg, an industrial surgeon, testified that he had examined the plaintiff and found that muscles in plaintiff's right arm showed evidence of atrophy as did the mid-portion of plaintiff's right palm. It was his opinion that the plaintiff cannot perform very simple fine intensive movements that require quick co-ordination. Plaintiff's hand, due to the injuries it sustained, has the mobility and function of the hand of a gorilla. Plaintiff has only a 10-degree flexion in certain joints of his injured hand. Because the hand in the area of the skin grafts is less sensitive to stimuli than normal skin in that area, the hand lacked nature's normal warning system to protect it from injury; therefore, a burn, split, or cut in the area of the skin grafts would be more susceptible to injury and infection than a normal hand. Dr. Goldenberg was of the opinion that plaintiff's hand had one-fifth the power of a normal hand and had suffered a 60-percent disability. The split thickness skin graft was subject to trauma, a tendency to split, to crack, and to cause injury when coming in contact with an outside force. Due to the injuries in plaintiff's hand, there are few jobs for which he would be industrially employable.

■■ The assessment of damages is primarily a question of fact for the jury, and an appellate court should not substitute its judgment for that of the jury's as to amount to be awarded in a given case. (*Blyzes v. Midwest Towing Co., Inc.* (1969), 109 Ill. App. 2d 48, 248 N.E.2d 305; *Lau v. West Towns Bus Co.* (1959), 16 Ill. 2d 442, 158 N.E.2d 63.) Having read the entire record, we find that the jury's verdict was not excessive. Plaintiff's

life expectancy was 41.9 years. His annual salary from the defendant at the time of the injury was approximately $9,200. After the injury, his employment consisted of jobs subject to seasonal employment, farm worker, and garbage man. He was unable to secure a factory position, and his hand is 60 percent disabled. The evidence indicated that plaintiff's hand was susceptible in injury and that the consequences of any injury might be more serious than those of a normal hand; therefore, the jury could properly find that plaintiff would suffer great pain in the future. (*Blyzes v. Midwest Towing Co., Inc.* (1969), 109 Ill. App. 2d 48, 248 N.E.2d 305.) Further the jury could find the damage for pain and suffering and disfigurement were substantial. The evidence indicates that the initial injury was so severe that plaintiff went into shock. Initially he spent approximately six weeks in the hospital. Subsequently he spent two more periods in the hospital. He underwent numerous surgical procedures. At one point, he spent three weeks with his hand sutured to his abdomen.

In an effort to demonstrate that the jury's verdict was excessive, defendant relies on *Hedrich v. Borden Co.* (1968), 100 Ill. App. 2d 237, 241 N.E.2d 545, and *Goertz v. Chicago & North Western Railway Co.* (1958), 19 Ill. App. 2d 261, 153 N.E.2d 486. In *Hedrich*, plaintiff recovered a jury verdict of $175,000. Hedrich's injuries and medical treatments were analogous to those of Baldwin's. Hedrich's life expectancy was 23.3 years. The Hedrich court concluded that $175,000 was excessive where the future loss of earnings, reduced to present cash value, was $120,000. The verdict was reduced to $150,000. In *Goertz*, plaintiff was awarded $300,000 by the jury in compensation for the loss of both legs and one arm due to defendant's negligence. Plaintiff's life expectancy was 12 years and his future loss of wages of earnings were calculated at approximately $70,000. The appellate court found the verdict excessive and reduced it to $200,000. It is common knowledge that this country has undergone a lengthy period of inflation which commenced in the mid-1960's. Therefore, jury verdicts which were excessive in 1958 and the early part of this inflationary period are not excessive today and may, in some cases, even be deemed inadequate.

Defendant also relies on *Smith v. Illinois Central R.R. Co.* (1960), 29 Ill. App. 2d 168, 172 N.E.2d 803, in which the appellate court found that $50,000 recovered by plaintiff for the loss of two fingers on the left hand was excessive. That opinion, however, does not indicate that there was evidence of a loss of earnings or future pain and suffering caused by the injury. The opinion does state that plaintiff could not make a tight fist nor carry heavy objects; however, the relation between this disability and employability is not stated. Evidence of the foregoing are present in the

case before us; therefore, we find *Smith* inapposite to the case at bar.

For the reasons stated, the judgment of the Circuit Court of Madison County is affirmed.

Judgment affirmed.

EBERSPACHER and KARNS, JJ., concur.