FREDERICK CLEMONS, Plaintiff-Appellant, *v.* ALTON & SOUTHERN RAILROAD COMPANY, Defendant-Appellee.

Fifth District  No. 75-498

Opinion filed December 15, 1977.—Rehearing denied February 10, 1978.

Cohn, Carr, Korein, Kunin and Brennan, of East St. Louis (Rex Carr, of counsel), for appellant.

Walker & Williams, of Belleville (John B. Gunn, of counsel), for appellee.

Mr. JUSTICE JONES delivered the opinion of the court:

Plaintiff, Frederick Clemons, brought an action under the Federal Employers' Liability Act (45 U.S.C. §51 *et seq.*) against his former employer, Alton & Southern Railroad (hereinafter, Railroad), seeking damages for alleged injuries to his back. The case was heard before a jury in the circuit court of St. Clair County. The jury found for defendant and judgment was entered accordingly. Plaintiff's post-trial motion was denied. He appeals.

Plaintiff directs our attention to numerous alleged errors at trial which he believes had the cumulative effect of depriving him of a fair trial.

He contends that throughout the trial the Railroad's counsel engaged in improper and prejudicial argument and questioning with respect to: (1) plaintiff's relationship with a former co-worker named Alvin Wren; (2) plaintiff's drinking habits; and (3) the existence of a fall other than those testified to by plaintiff. Plaintiff further contends that the trial court erred in not excluding as hearsay a portion of the evidence deposition of a doctor in which he read the consultation note of a psychiatrist concerning plaintiff.

The jury's function of weighing contradictory evidence and judging the credibility of witnesses in order to draw the ultimate conclusions as to the facts was paramount in this case. This was so because no one other than plaintiff witnessed or testified concerning the fall which he claimed to have suffered as a result of the Railroad's negligence and because there were considerable conflicts of opinion and diverse diagnoses concerning plaintiff's back condition among the six physicians who testified at trial.

■■■ Because it is the classic function of the jury to decide these matters, its conclusion relating to negligence, causation, or any other factual matter will not be set aside merely because different conclusions could be drawn or because the judges feel that other results are more reasonable. (*Finley v. New York Central R.R. Co.*, 19 Ill. 2d 428, 167 N.E.2d 212; *Oliver v. Peoples Gas Light & Coke Co.*, 5 Ill. App. 3d 1093, 284 N.E.2d 432; *Firestone v. R. H. Lincoln, Inc.*, 23 Ill. App. 3d 320, 319 N.E.2d 60.) The jury's verdict here is not against the manifest weight of the evidence and should therefore not be set aside.

Plaintiff, however, properly notes that where the evidence is close and conflicting, the reviewing court must exert most careful and vigilant supervision to make certain that the verdict resulted from a fair and impartial trial (*Jackson v. Chicago Transit Authority*, 133 Ill. App. 2d 529,

273 N.E.2d 748). Where the jury could have decided either way, any substantial error which might have tipped the scales in favor of the successful party calls for a reversal. (*Littlefield v. Alton & Southern R.R.*, 96 Ill. App. 2d 470, 239 N.E.2d 147; *Kapelski v. Alton & Southern R.R.*, 36 Ill. App. 3d 37, 343 N.E.2d 207.) Before deciding whether any of the claimed errors, singly or cumulatively, deprived plaintiff of a fair and impartial trial, we shall summarize the more important facts of the case.

Plaintiff Clemons began working for the Railroad in 1969. On December 24, 1970, he was employed as a "trackman" in the maintenance-of-way department. On that day seven men, including plaintiff and his foreman, MacArthur Hayes, were in the process of "gauging" the tract in an area where a train had previously derailed. This area was near Illinois Route 111 and a railroad trestle referred to as Bridge 4.

According to plaintiff's testimony, the crew worked only a half day because it was Christmas Eve Day. At approximately 11:30 a.m. the foreman directed plaintiff and co-worker Alvin Wren to return some tools to the Railroad's truck. The truck was parked on the opposite side of Bridge 4 from where the men were working.

In order to cross the trestle and reach the truck, plaintiff and Wren walked down the middle of the tracks. Wren was leading the way. Before reaching the trestle, plaintiff tripped and although he tried to catch himself he slipped and fell to the ground, hitting the lower part of his back. Wren only saw the plaintiff getting up. The two finished their task and subsequently rode in the truck with the whole crew back to the Cooper Building (a central hall) at noon.

The plaintiff did not report the accident at the Cooper Building because he did not think he was hurt and because the Roadmaster was not there. Neither did he tell his foreman about the fall even though he rode in the truck's cab on the trip back. Plaintiff acknowledged that it was a company rule that all accidents be promptly reported to one's foreman.

Plaintiff experienced pain in his back later that evening. He reported the fall to his foreman on his first day back at work, December 28, 1970, and was thereafter admitted to the Missouri Pacific Employees' Hospital.

Since at the time of the accident plaintiff did not look to see what he slipped on, he returned to the Bridge 4 area with his brother-in-law in late January 1971, in an attempt to determine what made him fall. He observed ties which were higher than others and an accumulation of diesel oil between the rails. He decided at that time that he had slipped on the diesel oil. Plaintiff recounted that he first saw the oil there about one or two weeks before the accident or about the time he started working in the Bridge 4 area.

The accuracy of plaintiff's testimony was assailed by cross-examination and by conflicting testimony of other witnesses.

On cross-examination it was revealed that on January 21, 1971, plaintiff gave a statement in his own words about the accident to a Railroad claims agent. The statement was taken down by a court reporter. Plaintiff recalled stating that he had tripped and fell while on the way to the truck *to get a tool* and that he did not know what he tripped over. An accident report in plaintiff's hand dated January 5, 1971, also stated that he tripped and fell when going back to the truck.

Two co-workers, John Dace, Jr., and John Moran, testified for defendant. Both testified that Wren and plaintiff were not carrying tools when they left on the day in question and that there was no noticeable or unusual accumulation of oil or grease near the trestle.

Foreman, MacArthur Hayes, testified that he never noticed any accumulation of oil or grease in the middle of the track. He further testified that the crew had worked near Bridge 4 for only two or three days prior to the 24th. According to his testimony, the tools were carried to and from the job by means of a four-wheeled pushcart rather than by hand. Plaintiff and Wren asked to leave early to do some last minute Christmas shopping and did in fact leave some time before the others who worked half a day. He did not tell them to take any tools to the truck. To do so would have been illogical since Hayes and two crew members worked eight hours that day.

From the testimony of Dr. Samuel Ezenwa, it appears that the hospital notes made by that doctor upon plaintiff's admission to Christian Welfare Hospital in March 1972 indicated that plaintiff said he was injured at his job in 1970 when he fell down some steps carrying a heavy weight. On cross-examination, the doctor agreed that he would not have written down that plaintiff fell down steps if he had said he slipped on diesel oil. Dr. Ezenwa also testified that plaintiff was admitted because of exacerbated back pain caused by a recent fall down some steps. Plaintiff had testified that the only reinjury to his back occurred in early January 1972 when an explosion at the Railroad's yard tossed him out of bed, causing him to require hospitalization within a few days.

Plaintiff was hospitalized numerous times with back complaints and treated by various doctors from the time of the alleged fall until trial.

Dr. Herman Russell, an orthopedic consultant, was plaintiff's attending physician from his first admission in December 1970 through May 1971. The doctor's testimony was presented at trial by means of an evidence deposition.

The injury initially noted and treated by Dr. Russell during the first of several hospitalizations was a linear fracture of the transverse process of the second lumbar vertebra. His testimony indicated that he believed this fracture to be healed when plaintiff was released at the end of May. Dr. Russell concurred in an observation made by resident Dr. Shah pursuant

to an X ray taken in May that plaintiff's spine exhibited arthritic changes at the fifth lumbar vertebra and first sacral segment (L-5 and S-1) with slightly diminished disc space. He testified that such condition was visible in all X rays taken while plaintiff was under his care and that there were no significant changes in the condition shown in X rays covering the time period of December 28, 1970, to December 1, 1972. In Dr. Russell's opinion, the arthritic changes were the natural result of the plaintiff's doing lots of heavy lifting and bending.

Dr. Vincent Strangio, a general surgeon at the Missouri-Pacific Hospital, testified through his evidence deposition that a November 1971 X ray of plaintiff's spine showed general arthritic process, a healed fracture of the second lumbar vertebra (L-2) and minimal anterior compression of the fifth lumbar vertebra (L-5), probably secondary to old trauma.

His diagnosis was functional back pain, denoting that there was no organic reason for any pain. Dr. Strangio prescribed valium, a tranquilizer, because of a suspected psychogenic aspect of the problem. On cross-examination, he agreed that muscle spasms such as plaintiff experienced were objective signs of pain. Finding no references to compression of the fifth lumbar vertebra with respect to previous X rays, Dr. Strangio tendered his opinion that the compression occurred between June 9, 1971 and August or September 1971.

Dr. Francis Bihss, a certified radiologist of over 30 years experience, examined, during trial, X rays of plaintiff taken through 1972. He testified that they all showed that the body of plaintiff's fifth lumbar vertebra is smaller than that of the others. He diagnosed this as a wedging deformity produced by a deficiency or failure of appearance of secondary center ossification of the vertebra. Dr. Bihss further related that secondary ossification usually occurs at age 16 and that plaintiff had had this condition for a matter of years. The deformity produces a potentially weak back. Walking, stooping, lifting and similar activities could cause a narrowing of the disc space and the extrusion of the contents of the intervertebral space; any extruded material would lodge in the back portion of the spine and cause pain.

Dr. Bihss testified that there were no signs of recent injury to the vertebra. He explained that this wedging condition, in and of itself, could cause back pain. If a person did manual labor more problems could be created and the sufferer could have back pain even absent any blow to the back. On redirect examination by plaintiff, Dr. Bihss agreed that a fall sufficient to fracture a vertebra could aggravate such a latent condition and cause the onset of back pain.

Dr. Robert Lam, a neurologist, testified for plaintiff. Plaintiff had been referred to the doctor through plaintiff's trial counsel in late 1971. Since

that time he had seen plaintiff on numerous occasions, the last examination being after trial began. He testified that he always felt that there was pressure on plaintiff's nerve roots forming the sciatic nerve at the level of the fifth lumbar vertebra and first sacral segment, but as of his last examination, he was of the opinion that plaintiff had a ruptured disc which was pinching his nerve roots. He felt a fall sufficient to fracture the second lumbar vertebra would be sufficient to cause problems such as plaintiff was experiencing. Upon examination of X rays, Dr. Lam identified an arthritic spur and an anterior compression at the level of the fifth lumbar vertebra.

On cross-examination, Dr. Lam testified that he had never caused any X rays to be taken of plaintiff or reviewed any taken by anyone else. He did not perform a special X ray of the spine called a myelogram which would reveal whether anything, such as a ruptured disc, was obstructing the spinal nerves because of the plaintiff's reluctance to undergo the procedure. On recross, he agreed that plaintiff could have fractured his second lumbar vertebra and still have been free of any symptoms at the level of the fifth lumbar vertebra.

We first address plaintiff's contentions of error with respect to the Railroad's statements and questions concerning co-worker Alvin Wren.

■■ In opening statements, the counsel for the Railroad remarked that he believed the evidence would show that Wren and plaintiff were friends and that they took off early from work on the day in question to attend to personal business. Plaintiff contends this statement was improper, being wholly unsupported by evidence, and that it prejudiced the plaintiff in that it created an inference that plaintiff would have produced Wren at trial if he could support his version of the accident. He directs our attention to three cases: *Geisberger v. Quincy*, 3 Ill. App. 3d 437, 278 N.E.2d 404; *Colmar v. Greater Niles Township Publishing Corp.*, 13 Ill. App. 2d 267, 141 N.E.2d 652; and *Gillson v. Gulf, Mobile & Ohio R.R. Co.*, 42 Ill. 2d 193, 246 N.E.2d 269.

These cases do show that remarks in opening statements not supported by admissible evidence can be considered prejudicial; however, we do not find the instant remarks to be prejudicial. First, we cannot agree that these remarks are wholly unsupported by the evidence. Foreman MacArthur Hayes testified that both Wren and plaintiff asked to leave work to do some more Christmas shopping. Such activity could certainly be classified as personal business. Evidence as to their friendship was not so clear. Defendant argues that the evidence supplied by co-workers Dace, Moran and Hayes that the two left in Wren's car on the 24th implied their friendship. We note, however, that Dace declined to characterize Wren and Clemons as "buddies."

Even if we were to assume that the characterization of friendship was

not adequately supported, we could find no prejudice in this passing remark. The implication which plaintiff argues the jury got from this remark is oblique at best and unlikely to be harbored by the jury, especially in view of the fact that there was no indication that Wren could supply relevant testimony about the fall. The objected to remark is not comparable to those found in the cases cited by plaintiff.

Plaintiff next contends that it must be presumed that a question asked of plaintiff to which an objection was sustained before it was fully uttered planted in the jury's consciousness a purported inconsistency between plaintiff's testimony and the deposition of Wren since no curative instruction was given by the court. In view of the fact that the question was never completed and that an objection to it was promptly sustained, we find no basis to believe that plaintiff was prejudiced by the question.

Plaintiff also contends that a remark made by defendant during closing argument to the effect "If he wants to read in the entire deposition I took from Alvin Wren before the jury, I will be happy to do it" improperly implied that the deposition would damage plaintiff's case. We cannot agree. This remark was made in conjunction with an objection to plaintiff's final argument. The relevant context to the remark was as follows:

> "MR. CARR [plaintiff's counsel]: * * * Now, don't you know, even though they fired the man a couple of months ago, don't you know that if in the statement they took from Alvin Wren he contradicted Fred Clemons—
>
> MR. GUNN [defense counsel]: I object most strenuously, and I move to withdraw a juror and declare a mistrial. *If he wants to read in the entire deposition I took from Alvin Wren before the jury, I will be happy to do it.*
>
> THE COURT: Mr. Carr, please restrain [*sic*] from making any mention of what Mr. Wren may have said or may not have said. * * *." (Emphasis added.)

Since the comment was elicited because of plaintiff's own improper argument, it is clear that he invited the remark. It is a well established rule that counsel cannot complain about error he himself invited. (*Rodriguez v. City of Chicago*, 21 Ill. App. 3d 623, 316 N.E.2d 88; *Pozzie v. Mike Smith, Inc.*, 33 Ill. App. 3d 343, 337 N.E.2d 450.) Moreover, the alleged damaging implication to plaintiff cannot be found to have been created when his own remarks implied precisely the opposite. In addition, plaintiff did not object to the above remark. Unless the alleged remarks are so prejudicial as to impair one's right to a fair trial and the judicial process itself, which is not the case here, the propriety of the remark is not preserved for review. *Sramek v. Logan*, 36 Ill. App. 3d 471, 344 N.E.2d 47.

Plaintiff next contends that defendant cross-examined plaintiff at length about his drinking habits in an attempt to suggest to the jury that he had been drinking at the time of the accident. He argues that this cross-examination was improper and prejudicial, requiring a remandment for new trial as in *Miller v. Chicago Transit Authority*, 3 Ill. App. 2d 223, 121 N.E.2d 348, and *Ferrer v. Vecchione*, 98 Ill. App. 2d 467, 240 N.E.2d 439. He further argues that the prejudice caused by this questioning was exacerbated by defendant's remarks in closing argument that he didn't wish to imply that plaintiff was drunk on the day in question and that there was no evidence that he had even had a drink that day. We find this questioning and remark present no reversible error.

■■ Only one question was asked of plaintiff about his sobriety at the time of the accident. Defendant asked, "And you weren't drinking anything at that time, were you"; plaintiff answered negatively. This single question, especially when viewed in relation to the above disclaimer of evidence of plaintiff's intoxication did not deny plaintiff a fair trial. We note also that plaintiff did not object to this question as did the parties in both *Ferrer* and *Miller*.

■■ ■ The remainder of the cross-examination about plaintiff's drinking habits was directed at establishing whether he drank prior to the accident. Plaintiff testified that he would drink a beer after getting off work. Since no objection was made throughout this testimony, we need not consider alleged error as to this questioning. (*Dupay v. New York Central R.R. Co.*, 110 Ill. App. 2d 146, 249 N.E.2d 179.) In any event, we view the evidence of his prior drinking as relevant to a prospective consideration by the jury of his health and habits in assessing damages (see Illinois Pattern Instructions, Civil, No. 34.04 (given at trial)) as plaintiff's proffered evidence of his drinking after the accident to ease his pain.

Plaintiff next contends that he was prejudiced by questions on cross-examination about another fall, which he claims was alluded by defendant to have occurred *prior* to December 24, 1970. He argues that these questions were foundations for impeachment as to a prior accident which defendant never attempted to make. Such conduct is properly condemned (see *e.g., Geisberger v. Quincy; Gordon v. Checker Taxi Co.*, 334 Ill. App. 313, 79 N.E.2d 632), but is not present here. We have examined the record and find that defendant was clearly inquiring whether plaintiff told Dr. Ezenwa when he was hospitalized in March of 1972 that he had fallen down some steps immediately prior to that admission. This was questioning about a *subsequent*, not a *prior*, accident, obviously pursued for its impeachment value. This question was properly followed by subsequent impeachment in the form of Dr. Ezenwa's testimony.

Plaintiff argues in the same vein with respect to the question "One of your legs didn't go through the opening there, did it?" We agree that no proof of such occurrence was ever made but believe such question did not prejudice defendant.

Plaintiff also complains of several statements in defendant's closing arguments as being references to matters not in evidence, violating the rule of *Anderson v. Universal Delta*, 90 Ill. App. 2d 105, 234 N.E.2d 21.

The great bulk of these alleged prejudicial remarks were not objected to and thus not preserved for appeal. (*Mulvey v. Illinois Bell Telephone Co.*, 53 Ill. 2d 591, 598, 294 N.E.2d 689; *Sramek v. Logan*, 36 Ill. App. 3d 471, 344 N.E.2d 47.) Moreover, we are of the opinion that none of the remarks could be construed as asserting that there was evidence of another fall having caused plaintiff's difficulties. Rather, they were framed in such a manner as to emphasize the importance of plaintiff's credibility to the case.

■■ Plaintiff's last contention is that it was error for the court to permit a portion of Dr. Vincent Strangio's evidence deposition in which he read the consultation note of psychiatrist, Dr. Bronson, concerning plaintiff to be read before the jury. Plaintiff maintained in his objection at trial and in this court that the report was hearsay, prejudicial and not drawn to a reasonable degree of medical certainty.

The deposition of Dr. Strangio was presented by plaintiff in his case-in-chief. His objection to the reading of the consultation note was lodged outside the presence of the jury prior to the reading of the deposition. Dr. Strangio's testimony revealed that he examined and treated plaintiff during his hospitalization in November 1971. On the recommendation of Drs. Strangio and Ford, plaintiff was examined by Dr. Bronson, a psychiatrist. The purpose of this referral was to ascertain what part plaintiff's mental or emotional status might be playing in reference to his complaints. Dr. Bronson rendered a written consultation opinion to Dr. Strangio, and Dr. Strangio's diagnosis and treatment was based, in part, on this report. The report was not admitted into evidence nor was Dr. Bronson called as a witness; however, Dr. Strangio read the note which contained the statement, "Believe possible malingering, is good possibility."

This court confronted an identical situation and assertion in *Smith v. Williams*, 34 Ill. App. 3d 677, 339 N.E.2d 10. In *Williams*, a treating physician, Dr. Tierney, read before the jury a report of staff psychiatrist, Dr. Melendez. This reading was over the objection of plaintiff. Dr. Tierney had referred the plaintiff to the psychiatrist and relied in part on his consultation report in prescribing medicines for the patient. The report stated that the "organic workup proved to be negative," related a history of "somatic complaints" and concluded with a diagnosis of

"depressive neurosis." The report was not offered into evidence, and Dr. Melendez was not a witness at trial. Under these facts, which are indistinguishable from those at bar, this court found under the authority of *People v. Ward*, 61 Ill. 2d 559, 338 N.E.2d 171, that the testimony of Dr. Tierney was admissible as an exception to the hearsay rule. We are of the opinion that the objected-to testimony of Dr. Strangio was equally admissible.

██ Even if this testimony were inadmissible, it would be harmless error since it was merely cumulative to Dr. Russell's testimony that plaintiff's organic injuries were healed by May 1971 and Dr. Strangio's testimony that plaintiff had functional back pain. *Becherer v. Best*, 74 Ill. App. 2d 174, 219 N.E.2d 371; *McIntyre v. Wood River Towing Co.*, 37 Ill. App. 3d 488, 346 N.E.2d 420.

For the foregoing reasons, we find that plaintiff was not denied a fair and impartial trial. Consequently, the judgment of the circuit court of St. Clair County is affirmed.

Affirmed.

CARTER, P. J., and KARNS, J., concur.